**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 14 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NOVELL, INC., a Utah corporation,

    Plaintiff-Appellant,

        v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation,

    Defendant-Appellee.

No. 97-4050

---

**Appeal from United States District Court**
**for the District of Utah**
**(D.C. No. 95-CV-837-G)**

---

Robert D. Brugge, of Spray, Gould & Bowers, Los Angeles, California (Thomas R. Karrenberg and John P. Mullen, of Anderson & Karrenberg, Salt Lake City, Utah, with him on the brief), for the appellant.

Timothy M. Thornton, Jr., of Nelsen, Thompson, Pegue & Thornton, Santa Monica, California (Malena Dobal, of Nelsen, Thompson, Pegue & Thornton, Santa Monica, California, and Donald Purser, of Donald Purser & Associates, Salt Lake City, Utah, with him on the brief), for the appellee.

---

Before **BRISCOE**, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff filed this action against its general liability insurance carrier for declarative relief and damages arising out of defendant's alleged failure to defend plaintiff. On cross-motions for summary judgment, the district court entered judgment in favor of defendant. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Novell, Inc. merged with WordPerfect Corporation, acquiring its assets, stock, and business (which apparently consisted primarily of computer software). Michael Ross is the sole proprietor of Enhancement Software, which developed and sold software known as "StampIt." StampIt was designed to work as an "add-on" program to various versions of WordPerfect software and allowed users to "stamp" their documents with a number of predefined stamps ("copy," "draft," etc.) when they were printed. Between August 1992 and December 1993, Ross advertised the StampIt program in various Novell/WordPerfect publications. In conjunction with advertising in WordPerfect Magazine, Ross also utilized reader service cards contained in the back of the magazine to allow readers to request additional information.

At some point in 1993, Novell/WordPerfect licensed an add-in program known as "ExpressDocs" to work with WordPerfect 5.1 DOS and WordPerfect 5.1 Windows. The program was similar to the StampIt program in that it allowed users to print documents with several predefined "watermark" inscriptions. The ExpressDocs program was subsequently bundled into WordPerfect 6.0 Windows, and Novell/WordPerfect

advertised, marketed, and generally promoted the add-in program as well as the ExpressDocs feature of WordPerfect 6.0 Windows.

Between June and November 1993, Ross sent various letters to Novell/WordPerfect, complaining about its course of conduct in marketing the ExpressDocs program. On November 19, 1993, Novell/WordPerfect filed a civil action in Utah federal district court against Enhancement Software, seeking a declaration of rights and obligations of the parties with regard to the StampIt software. In January 1994, Novell/WordPerfect refused to accept further advertising for the StampIt software.

On March 14, 1994, Ross filed a diversity action in California federal district court against Novell/WordPerfect. In his complaint, Ross alleged he joined Novell/WordPerfect's third-party developer program in late 1991 or early 1992 and, in doing so, he was encouraged to advertise in its publications, rent its mailing lists, and spend time, effort, and money in developing, marketing, and licensing StampIt. He further alleged he had discussions with Novell/WordPerfect employees in June 1992, who represented it was the company's policy to encourage third parties to develop add-on programs and that it would not use, appropriate, or usurp ideas or concepts incorporated in StampIt or do anything to compete with Ross or otherwise dilute the market for StampIt. Ross alleged that in March 1993, he entered into a contract with Novell/WordPerfect whereby he became a registered developer, and that he paid for the benefits associated with becoming a registered developer and provided a copy of StampIt

and its source code. Ross further alleged Novell/WordPerfect promised their relationship would be in the nature of a partnership. He asserted the subsequent development of the ExpressDocs program/feature violated representations made to him, effectively appropriated and usurped his research, development, and marketing efforts, and undermined his ability to market and license StampIt. Based upon these allegations, Ross asserted claims for fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, breach of confidence, unfair competition, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and breach of implied covenant of good faith and fair dealing. Ross filed identical counterclaims in the Utah declaratory judgment action. His diversity action was transferred to Utah and the two actions were assigned to the same district judge.

Plaintiff tendered the defense of Ross' action and counterclaims to defendant, who had issued a policy of general commercial liability insurance as well as a commercial excess umbrella policy. Defendant denied the tender of defense. The actions were dismissed on December 2, 1995, pursuant to a settlement agreement. Under the terms of the agreement, plaintiff paid Ross $28,500. Plaintiff incurred attorney fees of $102,766.75 in defending the claims.

## II.

We review the district court's grant of summary judgment de novo, applying the same standard used by the district court under Fed. R. Civ. P. 56(c). <u>V-1 Oil Co. v.</u>

-4-

Means, 94 F.3d 1420, 1422 (10th Cir. 1996). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). If there is no genuine issue of material fact in dispute, we must determine whether the district court correctly applied the law. Id.

**Contractual obligation to defend**

Plaintiff contends the district court erred in concluding defendant was not contractually obligated to defend plaintiff against Ross' claims and counterclaims. As both parties acknowledge, this issue hinges on interpretation of language in the policy of commercial general liability insurance (CGL) issued by defendant to plaintiff.[1]

Because this is a diversity action, we apply the substantive law of Utah, the forum state. See Barrett v. Tallon, 30 F.3d 1296, 1300 (10th Cir. 1994). Under Utah law, insurance policies are interpreted under general contract principles. Allstate Ins. Co. v. Worthington, 46 F.3d 1005, 1008 (10th Cir. 1995); Bergera v. Ideal Nat'l Life Ins. Co., 524 P.2d 599, 600 (Utah 1974). Whether a contract is ambiguous is a question of law to

_____

[1] The CGL and umbrella policies allegedly contain identical coverage language.

be determined by the court. See Allstate, 46 F.3d at 1008; Alf v. State Farm Fire & Cas. Co., 850 P.2d 1272, 1274 (Utah 1993). "Ambiguities in an insurance contract are construed against the insurer." Allstate, 46 F.3d at 1008. "Each case involving an insurer's promise to defend must be considered independently on the basis of the particular language of the insurance policy at issue." Simmons v. Farmers Ins. Group, 877 P.2d 1255, 1258 (Utah App. 1994). "Language limiting an insurer's duty to defend an insured must be clear, unambiguous, and sufficiently conspicuous in order to give proper notice to the insured of the limitations on the duty to defend." Id.

The CGL policy provided:

We will pay damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of: bodily injury or property damage caused by an occurrence; or personal injury or advertising injury to which this insurance applies.
This insurance applies: 1. to bodily injury or property damage which occurs during the policy period; and 2. to personal injury or advertising injury only if caused by an offense committed during the policy period.
We will defend any claim or suit against the insured seeking such damages. We will pay in addition to the applicable limit of insurance the defense expense.

Record II at 389. The CGL policy defined "advertising injury" as follows:

When used with respect to insurance under this policy: ADVERTISING INJURY means injury arising solely out of one or more of the following offenses committed in the course of advertising your goods, products or services:
1. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
2. oral or written publication of material that violates a person's right of privacy;

-6-

> 3. misappropriation of advertising ideas or style of doing business; or
>
> 4. infringement of copyrighted advertising materials, titles or slogans.

Id. at 408. Although there is some question about the meaning of the term "style of doing business," the remainder of the language is clear and unambiguous.

Generally speaking, the above-quoted language provides that an "advertising injury" exists, and defendant has a duty to defend plaintiff, when there is an injury arising solely out of one or more of the categorized offenses (i.e., slander, violation of privacy, misappropriation of advertising ideas or style of doing business, copyright infringement) committed by plaintiff in the course of promoting its goods, products, or services.[2] See generally Erie Ins. Group v. Sear Corp., 102 F.3d 889, 894 (7th Cir. 1996) (concluding the term "advertising," as used in insurance policy providing coverage for "advertising injuries," was unambiguous and meant "actual, affirmative self-promotion of the actor's goods or services"). In analyzing whether Ross' complaint triggered a duty on the part of defendant to defend, we first examine whether Ross' complaint alleged a predicate offense, i.e., one of the offenses specifically listed in the definition of "advertising injury." We then examine whether there was any causal connection between Ross' alleged injuries and plaintiff's advertising activities.

---

[2] A review of other policy language bolsters the conclusion that an "advertising injury" must arise directly out of the insured's written or broadcast advertising efforts. See Record II at 393 (policy exclusions).

**Existence of predicate offense**

The district court focused solely on whether there was a causal connection between plaintiff's advertising activities and the injuries alleged by Ross. Because it concluded such a causal connection was lacking, it did not determine whether any of the charged offenses fell within the scope of covered offenses listed in the policy. On appeal, the parties generally agree if plaintiff did commit a predicate offense listed in the policy, it could only have been "misappropriation of . . . style of doing business." The question is therefore what this term means under the policy and whether it encompasses any of the claims asserted by Ross.

Prior to 1986, CGL policies typically defined the term "advertising injury" as "injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan." See Terri D. Keville, Advertising Injury Coverage: An Overview, 65 S.Cal.L.Rev. 919, 926 (1992); see also Curtis-Universal, Inc. v. Sheboygan E.M.S., Inc., 43 F.3d 1119, 1122 (7th Cir. 1994). Litigation over policies incorporating this definition often focused on the meaning of the term "unfair competition," which can either be defined narrowly to mean the tort of "passing off," i.e., endeavoring to substitute one's own goods or products in the markets for those of another, or broadly to include "a whole host of loosely defined, unethical business

practices." 65 S. Cal. L. Rev. at 928.

In 1986, the Insurance Services Office, an entity that publishes standard forms widely used in the property-and-casualty insurance industry, revised the definition of "advertising injury" in its standard forms. In particular, it replaced the term "unfair competition" with the phrase "misappropriation of . . . style of doing business." 65 S. Cal. L. Rev. at 927. Since then, courts have construed the phrase "misappropriation of . . . style of doing business" in varying ways. Most seem to agree the phrase "style of business" unambiguously refers to "'a company's comprehensive manner of operating its business.'" St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Sys., Inc., 824 F.Supp. 583, 585 (E.D. Va. 1993), aff'd, 21 F.3d 424 (4th Cir. 1994); see also Applied Bolting Tech. Prod., Inc. v. United States Fidelity & Guar. Co., 942 F. Supp. 1029, 1034 (E.D. Pa. 1996), aff'd, 118 F.3d 1574 (3d Cir. 1997); Poof Toy Prods., Inc. v. United States Fidelity & Guar. Co., 891 F.Supp. 1228, 1232 (E.D. Mich. 1995); Fluoroware, Inc. v. Chubb Group, 545 N.W.2d 678, 682 (Minn. App. 1996) (citing St. Paul with approval); Atlantic Mut. Ins. Co. v. Badger Med. Supply Co., 528 N.W.2d 486, 490 (Wis. App. 1995) (citing St. Paul and concluding "style of doing business" could include "distinctive sales techniques"). However, there is disagreement concerning whether the phrase is synonymous with "trade dress." *Compare* Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co., 99 F.3d 795, 802 (6th Cir. 1996) (concluding overall phrase is unambiguous and refers "to a category of actionable conduct separate from trademark and trade dress

infringement" and involves "the unauthorized taking or use of [another's] interests"), *and* Badger, 528 N.W.2d at 490 (concluding misappropriation of style of doing business is not the same as infringement of trade dress, because trade dress requires a likelihood of confusion, while the tort of misappropriation has no such requirement), *with* Applied Bolting, 942 F. Supp. at 1034 (suggesting "trade dress" is synonymous with "style of doing business"), Dogloo, Inc. v. Northern Ins. Co. of New York, 907 F. Supp. 1383, 1389 (C.D.Cal. 1995) (concluding "style of doing business" refers to trade dress infringement), Union Ins. Co. v. Knife Co., Inc., 897 F.Supp. 1213, 1215-16 (W.D.Ark. 1995) ("'passing off' and trademark infringement constitute 'misappropriation of advertising ideas or style of doing business'"); Poof Toy, 891 F.Supp. at 1233 ("claim . . . for trademark and trade dress infringement constitute[s] an 'advertising injury,' under the enumerated definition 'misappropriation of advertising ideas or style of doing business'"); Owens-Brockway Glass Container, Inc. v. International Ins. Co., 884 F.Supp. 363, 369 (E.D.Cal. 1995) (although coverage for "advertising injury" does not cover patent infringement, "'style of business' refers to the outward appearance or signature of a business, the sort of claim comprised under trade dress"), aff'd, 94 F.3d 652 (9th Cir. 1996), *and* St. Paul, 824 F.Supp. at 585 ( concluding phrase "style of doing business" is synonymous with trade dress).

We find it unnecessary to definitively construe the phrase "style of doing business" because none of the above-described definitions provide relief to plaintiff. Clearly, there

was no misappropriation of trade dress since Ross never alleged plaintiff attempted to mimic the outward appearance of StampIt when it created and sold ExpressDocs. Further, although Ross alleged plaintiff capitalized on his research, development, and marketing efforts for StampIt when it created and sold its competing ExpressDocs program, there was no allegation that plaintiff misappropriated Ross' comprehensive manner of operating his business. Accordingly, we conclude none of Ross' claims against plaintiff constituted predicate offenses under the policy.

**Causal connection between alleged injuries and advertising activities**

Even assuming, arguendo, that one or more of Ross' claims did constitute the offense of "misappropriation of . . . style of doing business," there is nothing indicating such offenses were committed in the course of Novell/WordPerfect advertising its goods, products or services. Although plaintiff points to language in Ross' complaint alleging Novell/WordPerfect misappropriated his "marketing of StampIt," this simply does not demonstrate the necessary connection between the alleged offense and advertising of its own products. A review of Ross' entire complaint demonstrates Ross alleged he developed a market for the StampIt software, only to have Novell/WordPerfect create an identical product and effectively close him out of the market. These allegations do not fit within the CGL policy language entitling plaintiff to a defense.

Plaintiff relies heavily on Sentex Systems, Inc. v. Hartford Accident & Indemnity Co., 882 F. Supp. 930 (C.D.Cal. 1995), aff'd, 93 F.3d 578 (9th Cir. 1996), a case

involving similar (but not identical) "advertising injury" policy language. The insured,

Sentex Systems, designed and manufactured telephone entry security systems for

buildings and gated communities. ESSI, a competitor of Sentex, filed suit against Sentex

and Paul Colombo, a former ESSI employee hired by Sentex. In pertinent part, the

complaint alleged Sentex, through Colombo, misappropriated ESSI's "trade secrets and

other confidential information" including "customer lists, methods of bidding jobs,

methods and procedures for billing, marketing techniques, and other inside and

confidential information." Id. at 935. ESSI further alleged Colombo used ESSI's trade

secrets to promote and advertise Sentex's products and to solicit business from ESSI's

customers. Sentex filed suit against Hartford, its general liability insurer, claiming

Hartford breached its contract by refusing to tender a defense to the ESSI action. In

concluding Hartford had a duty to defend Sentex, the district court concluded the offenses

alleged by ESSI were committed by Sentex "in the course of advertising" its products and

services. More specifically, the court concluded the term "advertising" encompassed "the

kind of personal, one-on-one and group solicitations that Colombo engaged in on behalf

of Sentex and for which ESSI complained." Id. at 939.

Whether or not the Sentex decision is correct[3], its underlying facts are different

---

[3] California courts have adopted a minority view of the term "advertising" by defining it to include one-on-one oral representations to potential customers. See 65 S. Cal. L. Rev. at 942. The majority of other courts considering the issue, however, have held "advertising" requires broad distribution of the material or information in question. Id. at 937-40.

from those at hand. In <u>Sentex</u>, the underlying litigation contained allegations that Sentex (the insured) had misappropriated various trade secrets (customer lists, bidding methods, marketing techniques, etc.) from its competitor, and was using those secrets to promote its own competing products. In short, the alleged misappropriation of trade secrets took place directly (and solely) in the course of Sentex promoting its own products, and thus the alleged injuries flowed directly from Sentex's advertising activities. In fact, in affirming the district court's opinion in <u>Sentex</u>, the court stated: "It is significant that ESSI's claims for misappropriation of trade secrets relate to marketing and sales and not to secrets relating to the manufacture and production of security systems." 93 F.3d at 580. Here, Ross alleged Novell/WordPerfect, in direct violation of its own oral and written representations to Ross, misappropriated his product idea (StampIt) and developed and marketed a competing product (ExpressDocs). Even if Novell/WordPerfect advertised or otherwise marketed ExpressDocs, the violations alleged by Ross were not the direct result of Novell/WordPerfect doing so. Rather, Ross was injured when Novell/WordPerfect created and sold a competing product in direct contravention of oral and written statements to him. The fact it may have advertised the competing product to consumers simply did not cause Ross' injuries.

More closely on point are two other cases from the Ninth Circuit, <u>Microtec Research, Inc. v. Nationwide Mutual Insurance Co.</u>, 40 F.3d 968 (9th Cir. 1994), and <u>Simply Fresh Fruit, Inc. v. Continental Insurance Co.</u>, 94 F.3d 1219 (9th Cir. 1996), both

of which rely on a California Supreme Court decision, Bank of the West v. Superior Court, 833 P.2d 545 (Cal. 1992). In Bank of the West, the California Supreme Court held an "'advertising injury' must have a causal connection with the insured's 'advertising activities' before there can be coverage." Id. at 560. In reaching this conclusion, the court noted the CGL policy before it (like the one at issue in this case) strongly indicated the requirement of a causal connection. In particular, the policy listed various offenses that could give rise to "advertising injury," most of which had a clear causal connection with advertising (e.g., defamation, violation of right of privacy, infringement of copyright, etc.). Id. In addition, the court concluded common sense required there to be such a causal connection:

> Virtually every business that sells a product or service advertises, if only in the sense of making representations to potential customers. If no causal relationship were required between "advertising activities" and "advertising injuries," then "advertising injury" coverage, alone, would encompass most claims related to the insured's business. However, insureds generally expect to obtain such broad coverage, if at all, only by purchasing several forms of insurance, including coverage for "errors and omissions liability," "directors and officers liability," "completed operations and product liability," and/or other coverages available as part of a CGL policy.

Id. Under the rule adopted in Bank of the West, for example, a claim of patent infringement based upon the sale of an infringing product does not occur "in the course of advertising activities," and thus does not give rise to an "advertising injury," even though the insured advertises the infringing product to its customers or potential customers. Id. at 559.

-14-

In Microtec, the insured sued its liability insurance companies for defense of a suit filed against it by Green Hills Software, Inc.  In the underlying action, Green Hills alleged Microtec had passed off as its own computer code written by Green Hills.  Like Ross' complaint in this case, Green Hills' complaint asserted a broad range of claims, including false designation of origin, unfair competition, breach of contract, misappropriation of trade secrets, intentional interference with prospective economic advantage, breach of confidence, and fraud.  In rejecting Microtec's argument that Green Hills' allegations constituted "advertising injuries," the court acknowledged Green Hills' complaint used various words such as "marketing" that might, if taken in isolation, suggest such an injury.  However, the court concluded, the harm was "allegedly caused by misappropriation of the [computer] code, not by the advertising itself."  40 F.3d at 971.

In Simply Fresh Fruit, the insureds, Simply Fresh Fruit, Inc. and P&C Services, Inc., worked together in the business of processing and selling fresh fruit and fruit segments.  They were sued by a competitor who claimed the insureds infringed on its secret automated process for slicing fruit.  In a subsequent suit filed against their insurer, the insureds claimed they were entitled to a defense against the infringement suit under the "advertising injury" provisions of their respective policies.  The court rejected the insureds' claims, concluding none of the allegations in the underlying action arose in the course of the insureds' advertising activities, even though the insureds admittedly gave prospective and current customers tours of their automated processing facilities to

highlight the improved quality of their fruit products. In particular, the court emphasized that, "under the policy, the *advertising activities* must *cause* the injury--not merely expose it." Id. at 1223.

The decision in Advance is also helpful. The insured, Advance Watch Company, was sued by a competitor who alleged Advance had committed statutory and common-law trade dress and trademark infringement, unfair competition, and dilution by creating, advertising, and selling writing instruments substantially similar to those sold by the competitor. Advance filed suit against its liability insurance carrier, arguing it had a duty to defend Advance because the allegations of the underlying suit constituted "advertising injuries" under Advanced's insurance policy. In rejecting Advance's claim for defense, the court held there was not a sufficient nexus between the ground of asserted liability and Advance's advertising activities:

> [I]it was not Advance's advertising in itself which provoked [the competitor's] claim; it was the fact that in each advertisement which depicted [an Advance] writing instrument, there was, according to [the competitor], a writing instrument deceptively similar in shape and appearance to [the competitor's] writing instruments.
>     . . . [W]e conclude that even if Advance could be said to have misappropriated [its competitor's] advertising ideas or style of doing business, it cannot reasonably be said to have done so in the course of advertising its writing instruments, when it is the shape and appearance of the writing instruments themselves which [the competitor] claimed to have caused injury. Advance argues that the appearance of its . . . writing instruments was in itself advertising, but this argument proves too much, for it would invoke advertising injury coverage and the duty to defend whenever a product is merely exhibited or displayed.

99 F.3d at 806-07.

-16-

For the reasons outlined, it is clear there is neither a predicate offense nor a causal connection between Ross' alleged injuries and Novell/WordPerfect's advertising activities. Accordingly, we agree with the district court that defendant had no obligation to defend plaintiff in the underlying litigation.

**Collateral estoppel**

In a secondary argument, plaintiff argues defendant is collaterally estopped from denying its duty to defend because, in a recent lawsuit involving identical policy language and similar underlying litigation, a federal district court in Washington concluded defendant was obligated to defend its insured under the "advertising injury" portion of the policy.

The initial problem with the collateral estoppel argument, as pointed out by defendant, is that it is raised for the first time on appeal. Accordingly, we are under no obligation to consider it. See Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 578 n.6 (10th Cir. 1990) (declining to address collateral estoppel argument raised for the first time on appeal); Kenai Oil & Gas, Inc. v. Department of Interior, 671 F.2d 383, 388 (10th Cir. 1982) (same); Travelers Indem. Co. v. United States, 382 F.2d 103, 106 (10th Cir. 1967) (collateral estoppel is affirmative defense which must be raised at trial level and cannot be raised for first time on appeal). In any event, we find no merit to the argument because, even though the policy language may have been identical, the

underlying litigation was not.  Thus, the issue in the case at hand is not identical to the issue decided in <u>Microsoft</u>.  <u>See</u> <u>Gardner v. Madsen</u>, 949 P.2d 785, 788 (Utah App. 1997) (party asserting issue preclusion must demonstrate, in pertinent part, that the issue challenged is identical in the previous action and in the case at hand).

III.

The judgment of the district court is AFFIRMED.