**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80257**
**(303) 844-3157**

Patrick J. Fisher, Jr.                                                    Jane B. Howell
Clerk                                                             Chief Deputy Clerk

January 3, 2002

**TO:** ALL RECIPIENTS OF THE OPINION

**RE:** 01-5011, *IDG, Inc. and R. Brent Johnson v. Continental Casualty, et al.*
Filed on December 26, 2001

The opinion filed December 26, 2001, contains a clerical error. On page 1 of the slip opinion, Linda J. Burgess, appearing for the appellees, is a member of the firm of Winstead, Sechrest & Minick, Austin, Texas.

Please make the correction to your copy of the opinion.

Sincerely,

Patrick Fisher, Clerk of Court

By:   Belinda Begley
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 26 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

IDG, INC. and R. BRENT JOHNSON,

Plaintiffs-Appellants

v.

CONTINENTAL CASUALTY
COMPANY, TRANSPORTATION
INSURANCE COMPANY, and
VALLEY FORGE INSURANCE
COMPANY,

Defendants-Appellees

No. 01-5011

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 99-CV-111-B)**

_____

Steven M. Harris (Michael D. Davis with him on the brief) of Doyle Harris Davis
& Haughey, Tulsa, Oklahoma for Plaintiffs-Appellants.

Linda J. Burgess of Winstead, Sechrest & Minick, Austin, Texas (Frances E.
Patton of Pierce, Couch, Henrickson, Baysinger & Green, L.L.P., Oklahoma City,
Oklahoma with her on the brief) for Defendants-Appellees.

_____

Before **TACHA**, Chief Judge, **EBEL** and **GARTH**,[1] Circuit Judges

_____

_____
[1] Honorable Leonard I. Garth, United States Circuit Judge, United States Court of
Appeals for the Third Circuit, sitting by designation.

**GARTH**, Circuit Judge

_____

In the 1990s, plaintiffs-appellants IDG, Inc. and R. Brent Johnson, the majority stockholder and executive officer of IDG (together, "IDG"), purchased commercial insurance policies from defendants-appellees Continental Casual Company, Transportation Insurance Company and Valley Forge Insurance Company (collectively, "CNA").  Among other things, these policies provided liability and defense coverage in the event IDG was sued for  "advertising injuries" by third-parties.  In January 1999, IDG filed suit against CNA, claiming CNA was obligated to provide a legal defense under those policies for two lawsuits commenced against IDG by a former employee named Darrell Burson (the "Burson Lawsuits").  The district court granted summary judgment in favor of CNA, and IDG appealed.  For the reasons discussed below, we will affirm.


**I.**

During the relevant time period, IDG was insured under the following insurance policies: (1) Valley Forge Insurance Company's commercial general liability ("CGL") policies, Policy Nos. P1 27819677 (effective September 1993 to September 1994) and B1 31455338 (effective September 1994 to September 1996); (2) Transportation Insurance Company's CGL policies, Policy No. B1 57115402 (effective September 1996 to September 1999); and (3) Continental

Casualty Company's commercial umbrella policies, Policy No. B1 56852312

(effective September 1996 to September 1999).

The relevant portions of the CGL policies issued to IDG state the

following:

**COVERAGE B.  PERSONAL AND ADVERTISING INJURY LIABILITY**

1.  Insuring Agreement.

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or *"advertising injury"* to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages . . .

    b.  This insurance applies to: . . .

    (2) *"Advertising injury" caused by an offense committed in the course of advertising your goods, products or services* ; but only if the offense was committed in the "coverage territory" during the policy period. . . .

    \*    \*    \*

1.  "Advertising injury" means injury arising out of one or more of the following offenses:

    a.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
    b.  Oral or written publication of material that violates a person's right to privacy;
    c.  Misappropriation of advertising ideas or style of doing business; or
    d.  *Infringement of copyright* , title or slogan.

The commercial umbrella policies issued to IDG provide that CNA will pay

-3-

"all sums that the insured becomes legally obligated to pay as 'ultimate net loss' because of . . . 'advertising injury,' caused by an 'incident' which takes place during the policy period and in the policy territory." The definition of "advertising injury" under the umbrella policies is identical to that of the CGL policies.

## II.

On March 11, 1994, Darrell Burson, a former employee of IDG, filed suit against IDG and Johnson in state court (the "State Lawsuit"). Among other claims, Burson sought royalty and ownership rights to a series of computer programs known as SuperVision. Essentially, Burson alleged that he owned part or all of SuperVision, and that Johnson and he "entered into an agreement [regarding] the division of gross process from the sale of . . . SuperVision" and that "Johnson breached [that] agreement by concealing information regarding sales of SuperVision and by withholding and causing IDG to withhold [Burson's] share of the proceeds from the sales." Burson's First Amended State Complaint at ¶¶ 5-6. In addition, Burson sought unpaid wages and unpaid royalties, alleging conversion of SuperVision, breach of fiduciary duty, fraud, and breach of a stockholder agreement.

IDG notified CNA of the State Lawsuit on March 28, 1994, two weeks

-4-

after the suit was filed, seeking defense coverage under its insurance policies. On May 10, 1994, CNA declined to provide any defense or indemnity coverage of the suit on the ground that Burson's state action did not allege "advertising injuries" as covered by the policies. No additional information was sent to CNA until three years later in May 1997, when IDG requested that CNA re-evaluate coverage. On August 21, 1997, CNA denied IDG's request upon re-evaluation.

The state court eventually dismissed the ownership causes of action on the basis of federal preemption over copyright claims, and abated all the state law claims until the copyright related issues were resolved. The State Lawsuit was ultimately settled for approximately $50,000, but the copyright claims were decided in a federal lawsuit.

In September 1997, Burson filed suit in the United States District Court for the Northern District of Oklahoma alleging copyright infringement against IDG and others (the "Federal Lawsuit"). Burson contended that he was the author and owner of the copyrighted SuperVision program, and that IDG infringed his copyright by "cop[ying] some or all of the computer programs authored and copyrighted by Burson and . . . prepar[ing] unauthorized derivative software from Burson's computer programs." Federal Lawsuit Complaint at ¶ 3. IDG ultimately prevailed on the merits of this suit when the court – pursuant to a bench trial – agreed with IDG's "works made for hire" defense and found Burson

to have no ownership interest in the copyrighted works.

On September 3, 1998, one year after the Federal Lawsuit was filed and six weeks after it was tried before a federal judge, IDG notified CNA of the Federal Lawsuit, seeking coverage under its insurance policies. This was the first time CNA was informed of the existence of the Federal Lawsuit. CNA denied coverage for the Federal Lawsuit on September 22, 1998 and again on November 18, 1998 (upon reconsideration). In its November 18, 1998 letter, CNA informed IDG that it did not believe that the Federal Lawsuit involved claims that fell within the ambit of an "advertising injury" as contemplated under the insurance policies.

IDG filed suit against CNA on January 15, 1999 in Oklahoma state court, alleging breach of insurance contract and bad faith for failing to provide a defense to both Burson lawsuits. According to IDG, it incurred legal expenses totaling over $270,000 in defending the lawsuits, as well as $50,000 in settling the State Lawsuit. In February 1999, CNA removed the action to the U.S. District Court in the Northern District of Oklahoma.

The parties cross-moved for summary judgment in July 1999. By Order on December 26, 2000, the District Court found in favor of CNA. In so ruling, the district court found that there was no "advertising injury" as contemplated under the insurance policies. In particular, the court held that the method of promotion

utilized by IDG – providing trial copies of SuperVision to potential customers for their evaluation – was not an advertising activity because the product could not be an advertisement for itself. The district court also ruled that even if SuperVision could serve as an advertisement for itself, IDG failed to demonstrate the requisite causal nexus between Burson's alleged injuries and advertising activity.

## III.

We review the district court's grant of summary judgment de novo, applying the same standard used by the court below. V-1 Oil Co. v. Means, 94 F.3d 1420, 1422 (10th Cir. 1996). "Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Novell, Inc. v. Federal Ins. Co., 141 F.3d 983, 985 (10th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)). "We examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). If there is no genuine issue of material fact in dispute, we must determine whether the district court correctly applied the law." Novell, 141 F.3d at 985.

## IV.

In this diversity action, state law must be utilized in defining the terms of the insurance policies and in articulating the scope of CNA's duty to defend under those policies. See Novell, 141 F.3d at 985 (citing Barrett v. Tallon, 30 F.3d 1296, 1300 (10th Cir. 1994)). The parties do not dispute the application of

Oklahoma law to this matter and, accordingly, Oklahoma law is controlling.    See Mauldin v. Worldcom, Inc. , 263 F.3d 1205, 1212 (10 th Cir. 2001) (holding that parties may waive choice of law arguments by failing to adequately brief them); see also Gross v. Burggraf Constr. Co. , 53 F.3d 1531, 1547 (10th Cir.1995).

The Supreme Court of Oklahoma has stated that while an insurer's duty to defend its insured is broader than its duty to indemnify, this duty "is not unlimited."    First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland , 928 P.2d 298, 303 (Ok. 1996) (footnote omitted).  Rather, "the defense duty is measured by the nature and kinds of risks covered by the policy as well as by the reasonable expectations of the insured."    Id. (footnote omitted)  Accordingly, "an insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise to the  *potential of liability*  under the policy."   Id. (emphasis in original) (footnote omitted).  To have the "potential of liability," the "'complaint [must] state a cause of action that gives rise to the possibility of a recovery under the policy; there need not be a probability of recovery.'"    Id. at 303 n. 14 (quoting 7C Appleman, Insurance Law & Practice § 4683.01 at 67 (Berdal ed. 1979)).  This determination is made "on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer    at the time the defense is demanded (or tendered) rather than by the outcome of the third-party action."    Id. at 303-04.

Keeping these standards in mind, the question in this appeal becomes whether the Burson Lawsuits gave rise to the "possibility of" coverage under the insurance policies at the times IDG requested a defense from CNA. Because the only basis for coverage under the policies is for "advertising injury," the answer to this question necessarily entails an analysis of the meaning of that contractual term under Oklahoma law. [2]

In <u>Novell, Inc. v. Federal Ins. Co.</u>, we analyzed very similar language of an insurance policy involving the interpretation of "advertising injury." In our analysis, we utilized a two-part structure: (1) "we first examine whether [the underlying plaintiff's] complaint alleged a predicate offense, <u>i.e.</u>, one of the offenses specifically listed in the definition of 'advertising injury.' [(2)] We then

_____

[2] Under Oklahoma law, an "insurance policy constitutes a contract," subject to general interpretation principles of ordinary contract law. <u>See</u> <u>First Bank of Turley</u>, 928 P.2d at 303 n. 6 (<u>citing</u> <u>Silver v. Slusher</u>, 770 P.2d 878, 883 (Ok. 1988); <u>Christian v. Metropolitan Life Ins. Co., Okl.</u>, 366 P.2d 445, 488 (Ok. 1977); 12 Appleman, Insurance Law & Practice § 7004 at 34-56 (1981 & Supp. 1995)). Insurance contracts are to be interpreted "according to the plain meaning of the language in the policy," <u>VBF, Inc. v. Chubb Group of Insurance Co.</u>, 263 F.3d 1226, 1230 (10th Cir. 2001), and "must be accepted in their plain, ordinary and popular sense." <u>Torres v. Sentry Ins.</u>, 558 P.2d 400, 401 (Ok. 1976) (internal quotations omitted); <u>see also</u> <u>Max True Plastering Co. v. United States Fidelity and Guaranty Co.</u>, 912 P.2d 861, 865 (Ok. 1996) ("[the terms of an insurance contract] are given effect according to their ordinary or popular meaning."). If a policy term is ambiguous – <u>i.e.</u>, where it is susceptible to two or more different meanings – "it will be construed against the insurer." <u>VBF</u>, 263 F.3d at 1230-31 (internal quotations omitted). "In addition, Oklahoma recognize[s] the "reasonable expectations doctrine' when the policy is ambiguous or contains unexpected exclusions arising from technical or obscure language or which are hidden in policy provisions." <u>Id.</u> at 1231 (internal quotations omitted). Under this doctrine, "coverage exists, if the insurer or agent has created a reasonable expectation in the insured that coverage exists." <u>Id.</u>

examine whether there was any causal connection between [the underlying plaintiff's] alleged injuries and [the instant] plaintiff's advertising activities." Novell, 141 F.3d at 986. While we substantively applied Utah law in answering these questions, there is no reason why we should not utilize the same two-part structure in answering this question under Oklahoma law.

### A. Predicate Offense

Under the first prong of the Novell test (predicate offense), we must determine whether the Burson Lawsuits alleged one of the four offenses specifically listed in the definition of "advertising injury" in § 1(d) of the insurance policies. [3] CNA concedes the existence of a predicate offense, and does not dispute that the Burson's Lawsuits alleged copyright infringement as enumerated therein.

---

[3] As previously mentioned, ¶ 1(d) of the CGL policies issued to IDG states that "'[a]dvertising injury' means injury arising out of one or more of the following offenses:

> a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
> b. Oral or written publication of material that violates a person's right to privacy;
> c. Misappropriation of advertising ideas or style of doing business; or
> d. *Infringement of copyright*, title or slogan."

-11-

## B. Causal Connection

At issue here, therefore, is whether the second prong of the <u>Novell</u> test has been fulfilled — whether there was a "causal connection" between the injuries alleged by Burson (the copyright infringement) and IDG's advertising activities.

IDG contends that Burson's alleged injuries arose out of the course of IDG's advertisement of SuperVision. At the heart of this contention is IDG's reliance upon its promotional practice whereby it would distribute copies of SuperVision to potential customers for their evaluation with the hopes that they might buy it. IDG argues that this activity was indeed advertising activity and that Burson's alleged injuries were caused by it. As its evidentiary support of this assertion, IDG refers only to the following testimony adduced in the instant litigation: (1) Johnson's response to an interrogatory by CNA; [4] (2) Johnson's deposition testimony dated June 17, 1999, wherein he explained the purported "advertising" nature of certain activities by IDG concerning SuperVision; [5] and

---

[4] Johnson' response to Interrogatory No. 9 states:

      Mr. Burson's pleadings make claims related to copyright infringement for goods sold by Johnson/IDG which in turn were advertised for sale. From Mr. Burson's testimony such alleged conduct occurred as early as June 1993, some in September and October 1993, and at various times thereafter. The claims of Burson and the underlying facts present a potential for coverage when considered broadly under the policy. Because there is an allegation of placing the product on the market for sale, there was a potential that the infringement related to or was connected to advertising.

[5] Johnson testified at his deposition as follows:

      (continued...)

-12-

(3) Johnson's affidavit testimony provided on July 27, 1999, approximately one month after his deposition. [6]

Notwithstanding Johnson's self-serving characterizations of Burson's claims, a careful examination of Burson's underlying lawsuits belies IDG's contention. Even assuming that a product can advertise itself and that the

---

[5](...continued)

Q: . . . Tell me why – further why you contend that the State or Federal Lawsuit involved an assertion by Burson that he – the acts of which he complained, his injuries were caused by Johnson/IDG advertising its goods, products or services.

A: I mean, that's the whole thing of what we were doing. I mean, we were – we were making copies of programs which he claimed that were his. . . . That he had – that he at a later date filed copyright on, that we were – we were copying those and delivering those to customers so that they could evaluate them and to see whether or not they wanted to use them. We were – this is the manner in which – the manner in which we advertise our product is by providing people with free trials. We copy the programs. We send them out on some sort of electronic media and they install them, evaluate them, see how they work, observe them, and make a decision. . . . That is our method of operation, a method of advertising.

Q: So before you provide it to a customer for a demo, you've already copied what Mr. Burson claims was his proprietary interest?

A: Yes

[6] In ¶ 12 of his affidavit, Johnson stated:

Independent of the policy provisions that establish coverage, IDG and I have and had a "reasonable expectation" of coverage for defense and indemnity for the claims made in the "Burson Cases." This reasonable expectation comes in part from policy provisions that state that the insurer will defend claims made against IDG and me if they involve copyright infringement that occurs in the course of advertising. IDG and I copied Burson created source and object code in the course of and as part of IDG's advertising program for its products. Burson claims that IDG and I had infringed his copyright by copying the programs.

activity described by IDG is, in fact, "advertising" activity as broadly construed under the insurance policies, the record clearly reveals that Burson sued IDG for *copyright infringement* arising out of IDG's copying and sale of SuperVision, and *not out of its promotional activity*.

First, the gravamen of Burson's complaints is that IDG converted his portion of the copyright in SuperVision by "cop[ying] some or all of the computer programs authored and copyrighted by Burson and [by preparing] unauthorized derivative software from Burson's computer programs." See Federal Lawsuit Complaint ¶ 3. As a consequence, Burson contended that he "has suffered, and will continue to suffer, substantial money damages and impairment of his ownership rights in the computer programs. . . . [as a result of IDG] deriving illegal profits at Burson's expense." Id. at ¶ 4.

In the State Lawsuit, Burson sought "royalties due [to him] on the SuperVision project," First Amended State Complaint at ¶ 14, claiming that "Johnson breached the parties' agreement by concealing from [Burson] information regarding sales of SuperVision and by withholding and causing IDG to withhold [Burson's] share of the proceeds from the sales." Second Amended State Complaint at ¶ 6. These infringement claims do not contemplate, and certainly do not depend upon, the kind of promotional activity which Johnson described in his affidavits and deposition testimony. See, e.g., Farmington

-14-

Casualty v. Cyberlogic Tech., 996 F.Supp. 695, 704 n. 17 (E.D. Mich. 1998) ("when the claim for infringement exists irrespective of the advertising activities, the claim for defense must fail.").

Second, moving beyond the complaints – as we are required to do under Oklahoma law – IDG's points to no place in Burson's Federal or State Lawsuit pleadings or any other relevant source wherein any connection was made linking IDG's "advertising" practice with the injuries allegedly suffered by Burson. Nor is there any place in the proceedings of Burson's lawsuits supporting the proposition that the claims alleged by Burson were the result of any advertising activity by IDG, let alone from IDG's promotion of SuperVision. Indeed, at oral argument, IDG conceded that at no time during the federal trial or during the state proceeding did Burson make any reference to the promotional activity relied upon by IDG here.

Third, IDG fails to demonstrate that CNA was ever made aware of – or that CNA should have been aware of – IDG's practice of distributing free samples at the time coverage was requested. See First Bank of Turley, 928 P.2d at 303-04 (noting that insurer's duty to defend is determined "on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources *available to the insurer at the time the defense is demanded* (or tendered).") (emphasis added). Indeed, the affidavit and deposition testimony of

-15-

Johnson was procured during the course of this litigation, well after IDG's requests for coverage were tendered to CNA. See id. at 304 n. 19 ("the correctness of an insurer's decision to (or not) defend cannot be determined by 'later revealed facts' of which the insurer had no knowledge or notice."). Moreover, IDG fails to demonstrate that it made any information available to CNA at the time it requested coverage which could have led CNA to conclude that there was a possibility that Burson's alleged injuries had anything to do with advertising. Id. at 304 ("It is the insured's [IDG's] *sole* duty to give its insurer [CNA] timely *and adequate* notice of a third party claim to aid the insurer in the discovery of facts bearing on coverage.") (emphasis added) (footnote omitted).

The mere fact that SuperVision was advertised or distributed at some point in time is not sufficient to transform Burson's ownership infringement claims into advertising injury. See Novell, 141 F.3d at 988 ("The fact [the insured] may have advertised the competing product to consumers simply did not cause [the underlying plaintiff's] injuries"); see also Microtec Research, Inc. v. Nationwide Mut. Ins. Co., 40 F.3d 968, 971 (9 th Cir. 1994) ("If the [insured] does some wrongful act and then advertises it, harm caused by the wrongful act alone is not within the scope of the term advertising injury."); Farmington, 996 F.Supp. at 702 (holding that causal connection between alleged injuries and advertising activity cannot be satisfied by "a mere showing that the allegedly infringing

-16-

product was advertised."). "Otherwise, advertising injury coverage would apply whenever an advertised product or service is alleged to have caused harm, rendering the coverage applicable with respect to most claims against an insured business." Advance Watch Co., Ltd. v. Kemper National Ins. Co., 99 F.3d 795, 806 (6th Cir. 1996); see also National Union Fire Ins. Co. v. Siliconix Inc., 729 F.Supp. 77, 80 (N.D. Ca. 1989) ("Taken to its extreme, this argument would lead to the conclusion that any harmful act, if it were advertised in some way, would fall under the grant of coverage merely because it was advertised. Under this rationale, for instance, injury due to a defective product which is sold as a result of advertising activity and which later harms a consumer, may fall within the coverage grant. . . . Thus, a great many acts may fall within the ambit of advertising, extending injury coverage far beyond the reasonable expectations of the insured.").

In addition, the simple fact that Burson sought to enjoin the "distribution" of SuperVision in the federal complaint [7] or that he may have been entitled to statutory damages if he had prevailed on his copyright claims does not change the nature of Burson's alleged injuries. Those issues relate to the *remedies* available to Burson and do not change the nature of the injuries alleged in Burson's

---

[7] In the Federal Lawsuit, Burson sought the "[i]ssuance of a permanent injunction enjoining Defendants and all other persons working in concert from in any way copying *or distributing* copies of the programs." Federal Lawsuit Complaint at *3 (emphasis added).

lawsuits from "copyright" to "advertising." Nor do they address IDG's failure to demonstrate here that CNA was ever made aware of any connection between Burson's purported injuries and advertising activity at the time a defense was requested.

**V.**

There is nothing on this record to suggest that Burson's alleged injuries were sufficiently related to "advertising activity" on the part of IDG so as to invoke defense and/or liability coverage under the insurance policies at issue. For the foregoing reasons, the district court's judgment in favor of CNA will be AFFIRMED.