[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 6, 2002
THOMAS K. KAHN
CLERK

————————————————

No. 01-15497

————————————————

D. C. Docket No. 00-01838 CV-T-26

LARRY S. HYMAN, as
Assignee of Double R Specialty
Molding Co., Inc.,

Plaintiff-Appellant,

versus

NATIONWIDE MUTUAL
FIRE INSURANCE CO.,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————
**(September 6, 2002)**

Before BARKETT and MARCUS, Circuit Judges, and HIGHSMITH*, District Judge.

MARCUS, Circuit Judge:

---

*Honorable Shelby Highsmith, U.S. District Judge for the Southern District of
Florida, sitting by designation.

At issue in this appeal is whether a jury verdict against the Double R Specialty Molding Co., Inc. ("Double R") for violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is covered under a commercial general liability insurance policy issued by Nationwide Mutual Fire Insurance Co. ("Nationwide"). Both parties moved for summary judgment and the district court granted summary judgment in favor of Nationwide. It found that the verdict was not covered under the terms of the liability insurance policy because the Lanham Act violation could not result in an "advertising injury," as that term is defined in the policy, and that, even if it could, the jury's conclusion that Double R had acted "willfully" invoked a policy exclusion precluding coverage for advertising injuries caused "by or at the direction of the insured with knowledge of its falsity."

Upon careful review, we conclude that the Lanham Act violation gave rise to a covered "advertising injury" under the policy, that there was a causal connection between the injury suffered and Double R's advertising activities, and therefore that the jury award is covered under the insurance policy. Moreover, we find that because the "knowledge of falsity" exclusion in the insurance policy is ambiguous and, under Florida law, must be construed narrowly, it does not bar coverage in this case. Accordingly, we reverse the district court's grant of summary judgment

in favor of Nationwide and remand the case with instructions to grant Hyman's motion for summary judgment.

## I.

The relevant facts and procedural history are straightforward. On March 1, 1988, a patent was issued to Dale Klaus, vice-president of Inter-Global, Inc. ("Inter-Global"), for the design of a mounting for a particular type of outdoor plastic light.[1] Klaus assigned his rights to that patent to DAL Limited Liability Company ("DAL"), which then granted Inter-Global the right to manufacture and sell the mounting. Inter-Global, in turn, sold the mounting in two pieces designated as the B-1 and B-1S bases. In April 1989, Double R began manufacturing a similar mounting with pieces designated as DRB-1, DRB-1S, DRB-3, and DRB-3S bases. Both Inter-Global and Double R marketed their products to equipment manufacturers, which then sold completed lighting fixtures to retail stores.

In November 1994, Inter-Global and DAL filed suit against Double R in the United States District Court for the Eastern District of Missouri alleging patent

---

[1]The patent at issue is United States Letters Patent No. 4,729,073, entitled "Lamp Mounting."

infringement and unfair competition. The suit subsequently was transferred to the Middle District of Florida. The complaint alleged three causes of action: direct patent infringement; indirect or contributory infringement; and unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Lanham Act claim alleged that Double R had used artwork from Inter-Global's brochures in its advertisements and designated its products using model numbers similar to those used by Inter-Global.[2]

The case proceeded to trial in November 1998. The jury found in favor of Double R on the direct and indirect patent infringement counts, but found for Inter-Global and DAL on the Lanham Act claim.[3] The jury also found that Double R

---

[2]Apparently, Inter-Global's sale of the mounting pieces as B-1 and B-1S bases was consistent with its numbering scheme whereby products were designated by a model number beginning with the first letter of the name of the part. Thus, "accessories" were designated by model numbers beginning with "A," "bases" by model numbers beginning with "B," "cages" by model numbers beginning with "C," "panels" by model numbers beginning with "P," and "roofs" by model numbers beginning with "R." Double R apparently marketed several other products, in addition to the bases at issue in this patent infringement suit, using the same numbering scheme, but with "DR" in front of the first letter.

[3]With respect to the Lanham Act claim, the jury was instructed:

> On Inter-Global's claim of unfair competition based on false designation of defendants' products, it has the burden of proving by a preponderance of the evidence:
>
> (1)    The defendants sold products and falsely designated that

4

had acted willfully.  Accordingly, it awarded DAL and Inter-Global $400,000 in damages.  That award was modified by the district court in February 1999 to include $206,892 in prejudgment interest, for a total judgment of $606,892.

Subsequently, Double R sought indemnity for the judgment from Nationwide Mutual Fire Insurance Co., the insurance company from which it had purchased a commercial general liability insurance policy in December 1992.  The policy provides coverage for "'[a]dvertising injury' caused by an offense committed in the course of advertising [Double R's] goods, products or services."  It defines "advertising injury" to include:

> injury arising out of one or more of the following offenses:
>
> > a.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organizations' goods, products or services;

---

their
products were the same as Inter-Global's products;

(2) The defendants' conduct was likely to cause confusion, mistake, or to deceive as to the affiliation, connection, or association of the defendants with Inter-Global, or as to the origin, sponsorship, or approval of the defendants' products by Inter-Global; and

(3) Inter-Global was thereby damaged.

In order to find for Inter-Global on the issue of false designation, it is not required to prove actual confusion.

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

The "advertising injury" coverage is subject to the following exclusions:

This insurance does not apply to:

a. "Personal injury" or "advertising injury:"

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first-publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured . . . .

In response to Double R's claim under the "advertising injury" provision of the policy, Nationwide sent Double R a letter dated November 16, 1994, in which it denied coverage. Specifically, the letter stated that the Lanham Act claim did not constitute an "advertising injury" as that term is defined by the policy and that the

claim was subject to one or more of the exclusions described above. It also said

that the policy did not cover "willful" patent infringement or unfair competition.[4]

In December 1999, Double R effected an "Assignment for the Benefit of

Creditors," in which it assigned all assets, including "proceeds from insurance

policies" to Larry Hyman. In his capacity as Double R's assignee, Hyman filed

suit in state court in Hillsborough County, Florida on July 20, 2000 against

Nationwide. He sought a declaratory judgment establishing that the judgment

against Double R was covered by the insurance policy. Nationwide removed the

case to the Middle District of Florida. At the close of discovery, both Hyman and

Nationwide moved for summary judgment.

On August 23, 2001, the district court granted Nationwide's motion for

summary judgment and denied Hyman's motion. The district court concluded that

the "advertising injury" provision of the insurance policy did not cover Double R's

Lanham Act violation. Specifically, it found that the violation did not fall under

the coverage for "misappropriation of advertising ideas or style of doing business."

In addition, the district court found that, even if the violation gave rise to a covered

---

[4]The letter also stated that Nationwide "believe[d] the judgment represents an award of restitution regarding funds unlawfully obtained by Double 'R'" and that the policy did not provide coverage for such "ill-gotten gains" obtained as the result of willful conduct. No argument is presented on appeal regarding this statement.

"advertising injury," summary judgment in favor of Nationwide still would be proper because the "knowledge of falsity" exclusion barred coverage. Specifically, the district court concluded that the jury's finding that Double R had acted "willfully" invoked the policy exclusion precluding coverage for injuries "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." On appeal, Hyman argues that the district court erred in reaching those conclusions.

## II.

We review a "district court's grant of summary judgment <u>de novo</u>, applying the same legal standards used by the district court." <u>Gerling Global Reinsurance Corp. of Am. v. Gallagher</u>, 267 F.3d 1228, 1233 (11th Cir. 2001) (citing <u>Hilburn v. Murata Elecs. N. Am., Inc.</u>, 181 F.3d 1220, 1225 (11th Cir.1999)); <u>see</u> <u>also</u> <u>Gray v. Manklow (In re Optical Technologies, Inc.)</u>, 246 F.3d 1332, 1334-35 (11th Cir. 2001). Thus, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, we "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion," and resolve "[a]ll

reasonable doubts about the facts . . . in favor of the non-movant.'" Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

Further, we are required to apply Florida law to determine the meaning of the insurance policy. Thus, we look at the policy as a whole and give every provision its full meaning and operative effect. See Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1381 (11th Cir. 1993); Excelsior Ins. Co. v. Pomona Park Bar & Package Store, 369 So.2d 938, 941 (Fla. 1979). We start with the plain language of the policy, as bargained for by the parties. See Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000). If that language is unambiguous, it governs. Under Florida law, however, if the "relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the []other limiting coverage, the insurance policy is considered ambiguous," and must be "interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." Id. (internal citations and punctuation omitted).

The jury in the underlying infringement suit found that Double R had engaged in unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a),[5] which creates a federal cause of action for false designation of origin or trade dress infringement, see Epic Metals Corp. v. Souliere, 99 F.3d 1034, 1038 (11th Cir. 1996).[6] We must decide whether the injury compensated by that jury

[5]In relevant part, that section states:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (1998).

[6]The district court in this case and the parties on appeal use the terms "false designation of origin" and "trade dress infringement" interchangeably to describe Inter-Global's Lanham Act claim. The trial court in the underlying suit used neither designation, instead referring to the claim as one for "false designation." We note that, because it is based on Double R's use of model numbers confusingly similar to Inter-Global's distinctive model numbers to designate its products, the Lanham Act claim fairly could be described as either "trade dress infringement" or "false designation of origin." Without deciding whether it might be relevant in other circumstances, however, we find that distinction to be of no moment in this case.

10

award is covered by the terms of the insurance policy.  That question requires us to decide, first, whether the Lanham Act violation in this case gave rise to an "advertising injury," and, if so, whether there exists a "causal connection" between that injury and the "advertising activity" undertaken by Double R.  See, e.g.,

---

Indeed, it appears that "trade dress infringement" is a subset of the "false designation of origin" or "false or misleading description of fact" claims originally recognized under § 43(a). See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 777-80, 112 S. Ct. 2753, 2761-63, 120 L. Ed. 2d 615 (1992) (Stevens, J. concurring in the judgment) (explaining that, although § 43(a) was intended originally to cover only very specific and narrow types of claims, courts have "expanded the categories of 'false designation of origin' and 'false description or representation'" to create "a federal law of unfair competition" which includes "a federal cause of action for trademark and trade dress infringement claims") (internal citations and punctuation omitted).  Further, regardless of its name, the central concern in a § 43(a) case is whether the public is likely to be confused as to the manufacturer, attributes, or origin the of the product. See id., 505 U.S. at 780, 112 S. Ct. at 2763 ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical--is there a 'likelihood of confusion?'") (quoting New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1201 (9th Cir. 1979); Monsanto Co. v. Campuzano, __ F. Supp. 2d __, 2002 WL 1291995, at *6 (S.D. Fla. May 2, 2002) ("The central inquiry . . . is whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers.") (quotation omitted).

Thus, although there may be "false designation of origin" claims to which the analysis in this case would not apply, the Lanham Act violation in this case properly could be referred to either as "trade dress infringement" or "false designation of origin." Because the case law relevant to our analysis in this case deals with claims designated as "trade dress infringement," we refer to Inter-Global's Lanham Act claim as one for "trade dress infringement."

11

Novell, Inc. v. Fed. Ins. Co., 141 F.3d 983, 986 (10th Cir. 1998).[7]  The district court resolved both of those issues in the negative.  As the following discussion explains, we disagree.

A.

As we have noted already, the insurance policy lists four categories of covered harms that may constitute "advertising injuries."  The parties agree, and we concur, however, that only the  provision encompassing "misappropriation of advertising ideas or style of doing business" is relevant in this case.  Thus, the precise question presented is whether the trade dress infringement in the underlying suit constitutes a "misappropriation of advertising ideas or style of doing business."

---

[7]The district court stated that there were three steps to this analysis. Specifically, in addition to the two requirements listed above, it required Hyman to show that Double R was "engaged in 'advertising activity' during the policy period when the alleged 'advertising injury' occurred." Sentex Sys., Inc. v. Hartford Accident & Indem. Co., 882 F. Supp. 930, 939 (C.D. Cal. 1995); see also Elan Pharm. Research Corp. v. Employers Ins. Co. of Wausau, 144 F.3d 1372, 1375 (11th Cir. 1998) ("To fall within the coverage of the insurance policies, therefore, (1) [the] suit must have alleged a cognizable advertising injury; (2) [the infringing party] must have engaged in advertising activity; and (3) there must have been some causal connection between the advertising injury and the advertising activity."). The district court concluded that "Double 'R' engaged in advertising activities, which satisfies [that] prong of the test." Nationwide does not contest that finding, and the parties make no arguments related to it. Indeed, by distributing catalogs to equipment manufacturers in an attempt to sell the allegedly infringing product, Double R clearly engaged in advertising.

12

In answering that question, first we must decide more generally whether trade dress infringement can ever be a "misappropriation of advertising ideas or style of doing business." Because the language used in Nationwide's policy is standard for commercial general liability insurance policies, that question has arisen on several occasions in other jurisdictions. See, e.g., Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 746-47 (3d Cir. 1999) (stating that "[t]his is standard language for defining advertising injury in commercial general liability policies," and that "[w]ith varying degrees of success, insured parties have sought coverage for the underlying actions of patent infringement, trademark or trade dress infringement . . .") (citations omitted). We have not yet encountered it, however, and the courts that have decided the issue are divided. Compare Advance Watch Co. v. Kemper Nat'l Ins. Co., 99 F.3d 795, 802 (6th Cir. 1996) (concluding that "'misappropriation of advertising ideas or style of doing business' does not refer to a category or grouping of actionable conduct which includes trademark or trade dress infringement"), and Callas Enter., Inc. v. Travelers Indem. Co. of Am., 193 F.3d 952, 956-57 (8th Cir. 1999) (adopting, as an alternate holding, the reasoning of Advance Watch and concluding that trademark infringement cannot be an advertising injury under the policy), with Frog, Switch, 193 F.3d at 748 ("[W]hile some causes of action for unfair competition, theft of trade secrets, or

13

misappropriation may be covered by the standard policy, many are not."), and R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co., 287 F.3d 242, 247-48 (2d Cir. 2002) (finding that trade dress infringement was an "advertising injury" under a version of the standard policy covering injuries arising out of "[c]opying . . . advertising ideas or advertising style").[8]

The district court in this case followed the Sixth Circuit's approach and determined that "no trade dress claims . . . are covered under the 'advertising injury' provisions." We disagree and conclude that trade dress infringement may constitute a "misappropriation of advertising ideas or style of doing business."

As we must under Florida law, we begin with the language of the coverage section. See Auto-Owners, 756 So.2d at 34. Because none of the terms in that provision are defined in the policy, we accord each its ordinary meaning. See Thomas v. Prudential Property & Cas., 673 So.2d 141, 142 (Fla. Dist. Ct. App. 1996) ("[I]nsurance contracts must be read in light of the skill and experience of

---

[8]The Ninth and Tenth Circuits have mentioned this issue but have not resolved it. See Novell, 141 F.3d at 987 (stating that "there is disagreement concerning whether the phrase ['style of business'] is synonymous with 'trade dress,'" and declining to resolve the issue) (citations omitted); Sentex Sys., Inc. v. Hartford Accident & Indem. Co., 93 F.3d 578, 581 (9th Cir. 1996) (affirming district court, but expressing reservations about "the district court's broader conclusion . . . that allegations of misappropriation of a customer list, because it comes within common law concepts of unfair competition, can alone trigger coverage under the language of these policies pertaining to 'misappropriation of advertising ideas.'").

14

ordinary people, and given their everyday meaning as understood by the 'man on the street.'"). Initially, as it is commonly understood, advertising means the "action of calling something to the attention of the public." Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co., 165 F. Supp. 2d 1332, 1339 (S.D. Fla. 2001) (quoting Webster's Collegiate Dictionary (9th ed. 1983)). An "advertising idea," therefore, can be any idea or concept related to the promotion of a product to the public. See id. (citing Black's Law Dictionary (7th ed.1999), which defines advertising as "the action of drawing the public's attention to something to promote its sale"); Sentex Sys., Inc. v. Hartford Accident & Indem. Co., 93 F.3d 578, 580 (9th Cir. 1996) ("In this day and age, advertising cannot be limited to written sales materials, and the concept of marketing includes a wide variety of direct and indirect advertising strategies.").

Second, "style of doing business" is routinely defined, without explanation, as "unambiguously refer[ring] to 'a company's comprehensive manner of operating its business.'" Novell, 141 F.3d at 987 (citations omitted); see also Poof Toy Prods., Inc. v. United States Fid. & Guar. Co., 891 F. Supp. 1228, 1232 (E.D. Mich. 1995), rejected by Advance Watch, 99 F.3d at 805. So general a definition is of limited utility, but it is important to recognize that the phrase is meant to describe an "advertising injury." Accordingly, without defining the exact

parameters of the phrase, we conclude that "style of doing business" must include the manner in which a company promotes, presents, and markets its products to the public. See, e.g., St. Paul Fire and Marine Ins. Co. v. Advanced Interventional Systems, Inc., 824 F. Supp. 583, 585 (E.D. Va. 1993) (finding that "'[s]tyle of doing business' expresses essentially the same concept as the more widely used term: 'trade dress.'"), aff'd, 21 F.3d 424 (4th Cir. 1994).

We have no trouble finding that a product's trade dress may fall within the definitions of "advertising idea" or "style of doing business." Trade dress is defined as "the total image of a product and may include features such as size, shape, color or color combinations, textures, graphics, or even particular sales techniques." John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983) (citations omitted). Thus, while "the classic trade dress infringement action involved the packaging or labeling of goods," Epic Metals, 99 F.3d at 1038, it may "extend to marketing techniques" and can include certain "sales technique[s] designed to make the product readily identifiable to consumers and unique in the marketplace," Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 831 (11th Cir. 1982) (finding that the "adoption procedures and birth certificates" given with particular dolls were protectable trade dress). Because trade dress may encompass marketing or packaging designed to draw attention to a

16

product, it can constitute an "advertising idea" or "style of doing business" as those terms are defined above. Accord Adolfo House, 165 F. Supp. 2d at 1339 ("[O]ne reasonable interpretation of 'advertising ideas' and 'style of doing business' concepts . . . is that they encompass the physical appearance of a product -- the ornamental features that distinguish it from similar products and identify its source. Because trademark and trade dress serve this function, the concept of 'advertising idea' or 'style of doing business' may reasonably be interpreted to include these types of claims.").

It is only a short step, then, to conclude that the "misappropriation" of an advertising idea or style of doing business may include trade dress infringement. To prove a claim for trade dress infringement, the plaintiff must establish that "the trade dress of the two products is confusingly similar." Thus, the plaintiff must show that the infringing company's packaging, labeling, or marketing resembles closely those features of the original product. As it is commonly understood, the term "misappropriation" encompasses such an action. See, e.g., Webster's Third New International Dictionary 1442 (1986) (defining misappropriate to mean "to apply to illegal purposes" or "to appropriate dishonestly").

We are unconvinced by Nationwide's argument that "misappropriation" covers only injuries actionable under the common law tort of "misappropriation."

17

There is no indication in the policy that the phrase was intended to be so limited, and the ordinary meaning of the term misappropriation encompasses a wider spectrum of harms. See Adolfo House, 165 F. Supp. 2d at 1339 (rejecting this "restrictive gloss on the concept of 'misappropriation.'"); see also EKCO Group, Inc. v. Travelers Indemnity Co. of Ill., 273 F.3d 409, 412-13 (1st Cir. 2001) (raising this question without resolving it).

We believe, therefore, that the district court erred in relying on Advance Watch. The majority of courts outside the Sixth and Eighth Circuits to confront this question, including one applying Florida law, have rejected the reasoning of that case. See, e.g., Frog, Switch, 193 F.3d at 747 ("Advance Watch has been sharply criticized for ignoring the real contours of intellectual property litigation, which often proceeds under a bewildering variety of different labels covering the same material facts.") (citation omitted); Fid. & Guar. Ins. Co. v. Kocolene Mktg. Corp., No. 00-1106, 2002 WL 977855, at *9 (S.D. Ind. Mar 26, 2002) (Advance Watch is a minority view and is unpersuasive."); Adolfo House, 165 F. Supp. 2d at 1339-40 (applying Florida law); CAT Internet Sys. v. Providence Wash. Ins. Co., 153 F. Supp. 2d 755, 761-62 (E.D. Pa. 2001) (following Frog, Switch); Flodine v. State Farm Ins. Co., No. 99-C-7466, 2001 WL 204786, at *7 (N.D. Ill. March 1, 2001); Ryland Group, Inc. v. Travelers Indem. Co. of Ill., No. Civ. A-00-CA-233,

18

2000 WL 33544086, at *6 n.9 (W.D. Tex. Oct 25, 2000); <u>Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.</u>, 61 F. Supp. 2d 611, 616-17 (S.D. Tex. 1999); <u>Am. Employers' Ins. Co. v. DeLorme Pub. Co.</u>, 39 F. Supp. 2d 64, 76  (D.Me. 1999) ("The decision in <u>Advance Watch</u> is the great exception to the trend under the law . . ..");  <u>Indus. Molding Corp. v. American Mfrs. Mut. Ins. Co.</u>, 17 F. Supp. 2d 633, 638-39  (N.D. Tex.), <u>vacated pursuant to settlement</u>, 22 F. Supp. 2d 569 (N.D. Tex. Oct 13, 1998); <u>Gemmy Indus. Corp. v. Alliance General Ins. Co.</u>, 190 F. Supp. 2d 915, 920 (N.D. Tex. 1998) (finding that adopting the reasoning of <u>Advance Watch</u> "would circumvent well-established principles of contract construction"); <u>Energex Sys. Corp. v. Fireman's Fund Ins. Co.</u>, No. 96-CV-5993, 1997 WL 358007, at *3 (S.D.N.Y. June 25, 1997); <u>see</u> <u>also</u> <u>Dogloo, Inc. v. Northern Ins. Co. of N.Y.</u>, 907 F. Supp. 1383, 1388-90 (C.D. Cal. 1995) (deciding the issue prior to <u>Advance Watch</u>); <u>Poof Toy</u>, 891 F. Supp. at 1233; <u>Union Ins. Co. v. Knife Co.</u>, 897 F. Supp. 1213, 1215-16 (W.D. Ark. 1995); <u>Sentex Sys., Inc. v. Hartford Accident & Indem. Co.</u>, 882 F. Supp. 930, 941-44 (C.D. Cal. 1995); <u>J.A. Brundage Plumbing & Roto-Rooter, Inc. v. Mass. Bay Ins. Co.</u>, 818 F. Supp. 553, 558 (W.D.N.Y. 1993), <u>vacated pursuant to settlement</u>, 153 F.R.D. 36 (W.D.N.Y. 1994).[9]

---

[9]Even state courts in Michigan, the state whose law the Sixth Circuit applied in <u>Advance Watch</u>, have criticized the holding in that case.  <u>See</u> <u>Home-Owners Ins. Co. v. Thomas Lowe Ventures, Inc.</u>, No. 97-158, 1998 WL 1856221, at *2 (Mich. Ct.

Indeed, we agree that

> [t]o adopt [the Sixth Circuit's] reasoning here would do violence to principles of liability insurance policy construction well established under Florida law, which start with the basic premise that terms of an insurance contract must be given their plain, ordinary and generally accepted meanings viewed from the perspective of the average person, with insuring language given its broadest possible sweep and exclusionary language the narrowest possible reach.

Adolfo House, 165 F. Supp. 2d at 1339-40 (citations and footnote omitted).

Moreover, to the extent that the phrase "misappropriation of advertising ideas or style of doing business" could reasonably be interpreted to exclude all claims for trade dress infringement, that reading is, at best, no more persuasive than the interpretation we outline above. Accordingly, Florida law compels us to accept the interpretation that provides coverage for the insured. See Auto-Owners, 756 So.2d at 34 (stating that "[i]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the []other limiting

---

App. Aug. 27, 1998) ("[T]his court finds that trademark or tradedress infringement does constitute 'misappropriation of advertising ideas or style of doing business' because . . . a common meaning of the word 'misappropriation' . . . includes trademark or tradedress infringement."); Am. States Ins. Co. v. Hayes Specialties, Inc., No. 97-020037, 1998 WL 1740968, at *3 (Mich. Ct. App. March 6, 1998) ("Suffice it to say, the Court . . . agrees with defendant that the analysis and reasoning of the Sixth Circuit is not only unpersuasive and flawed, but demonstrates a lamentable lack of understanding and grasp of the law of trademark/trade dress, and ultimately lead to an unduly narrow holding and somewhat bizarre and tortured application of Michigan insurance law.").

20

coverage, the insurance policy is considered ambiguous," and must be "interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy."). We, therefore, reject the argument that trade dress infringement cannot constitute an "advertising injury" under the insurance policy. Accord Adolfo House, 165 F. Supp. 2d at 1339 n.3; see also Bay Elec., 61 F. Supp. 2d at 617 (reaching the same conclusion under Texas law).

Thus, trade dress infringement may, under certain circumstance, constitute a "misappropriation of advertising ideas or style of doing business." We note, however, that it will not always do so. See, e.g., EKCO Group, 273 F.3d at 413-14 (finding that a claim for trade dress infringement based on the design of a teapot did not involve "advertising" and, therefore, was not covered under the insurance policy); Frog, Switch, 193 F.3d at 748 ("[W]hile some causes of action for unfair competition, theft of trade secrets, or misappropriation may be covered by the standard policy, many are not."). Rather, for the injury to be covered under the policy, the trade dress at issue must constitute an "advertising idea" or "style of doing business" and it must have been "misappropriated."

We turn, then, to the trade dress infringement at issue in this case. The bases for Inter-Global's trade dress infringement claim were the model numbers used by Double R that were confusingly similar to Inter-Global's numbers and the artwork

21

from Inter-Global's advertisements used by Double R in advertising its products. Together, those aspects of the trade dress for the light mounting manufactured by Inter-Global clearly constitute an "advertising idea" or "style of doing business" as those terms are defined above. Indeed, the artwork and model numbers plainly were designed to promote Inter-Global's products by garnering attention to them in the catalogue. Further, the jury verdict finding that Double R had infringed that trade dress by using it in its own advertisements demonstrates that Double R had "misappropriated" the ideas.

Thus, in addition to finding that trade dress infringement generally may constitute a "misappropriation of advertising ideas or style of doing business," we are satisfied that the trade dress infringement committed by Double R gave rise to an "advertising injury" under the commercial general liability insurance policy. The district court erred in reaching a contrary result.

B.

Having determined that the trade dress infringement in this case constitutes a "misappropriation of advertising ideas or style of doing business," we are also required to determine whether there was a causal connection between the advertising injury and Double R's advertising activity. That requirement also originates from the policy's coverage for "[a]dvertising injury' caused by an

22

offense committed in the course of advertising." Thus, "the injury for which coverage is sought must be caused by the advertising itself." Microtec Research, Inc. v. Nationwide Mutual Ins. Co., 40 F.3d 968, 971 (9th Cir. 1994); see also Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 160 F.3d 54, 62 (1st Cir. 2001) ("Where there is no advertising, there can be no advertising injury."); Frog, Switch, 193 F.3d at 750 n.8 ("[T]he relevant tort liability principles . . . ask whether the advertising did in fact contribute materially to the injury.").

Simply selling an infringing product is not sufficient to satisfy the causal connection requirement. See Poof Toy, 891 F. Supp. at 1234 ("Courts have repeatedly rejected an insured's argument that advertising is part and parcel of selling and that an offense [that] occurs during selling is an offense committed in the course of the advertising.") (citations omitted). Rather, "the infringement [must] be committed in an advertisement rather than in the sale of a product in order to be covered." Dogloo, 907 F. Supp. at 1390-91; see also Frog, Switch, 193 F.3d at 750 n.8 (noting that "there is much confusion in the caselaw concerning when an 'advertising injury' is 'caused' by advertising within the meaning of standard business insurance policies," and stating that the most reasonable approach is to require "that the injury be complete in the advertisement"); Microtec, 40 F.3d at 971 ("If the tortfeasor does some wrongful act and then

23

advertises it, harm caused by the wrongful act alone is not within the scope of the term advertising injury.").

In this case, the district court, relying again on Advance Watch, found that there was no causal connection between Double R's advertising activity and the injury suffered by Inter-Global because "[t]he mere publication of an advertisement showing an infringing product is insufficient to establish the requisite advertising activity." That conclusion, however, ignores the scope of the conduct upon which the trade dress infringement claim was based, and we find that, when taken in its entirety, the claim establishes the requisite causal connection.

The trade dress infringement claim was based on Inter-Global's allegations that Double R used model numbers that were substantially similar to Inter-Global's model numbers to identify the parts of the light mounting. Specifically, Inter-Global alleged that "Double R has used and continues to use in commerce model numbers, which are similar to those used by Inter-Global, to identify products made by Double R that are identical in structure and appearance to products made by Inter-Global." (Compl. ¶ 22.) Those model numbers were used in Double R's catalogs, which were sent to manufacturers of light fixtures. In addition, Inter-Global argued at trial that "Double 'R' has used and continues to use in commerce

24

artwork from Inter-Global's advertising brochures in advertising its own products, including . . . advertisements in magazines with nationwide distribution . . . ." (<u>Id.</u> ¶ 21.)  Thus, Inter-Global argued that Double R did more than simply publish an advertisement containing a picture of the infringing product -- it claimed that Double R identified the product by the model numbers similar to Inter-Global's in an advertisement designed to look like Inter-Global's.

Moreover, Inter-Global claimed specifically that it had suffered an injury as result of the promotion and advertising of Double R's products as identified by the similar model numbers.  It argued that "[b]y using Inter-Global's artwork and model numbers in advertising, promoting, or marketing Double 'R''s products, Double 'R' . . . likely confused or deceived the general public and purchasers," (<u>Id.</u> ¶ 25), and that "[t]he effect of Double 'R''s advertising alleged hereinabove is to enable Double 'R' to pass off its products as those of Inter-Global or as having some association or affiliation with Inter-Global," (<u>id.</u> ¶ 26).

Argument and evidence presented at trial supported these allegations. Indeed, as the district court noted, "Inter-Global attached a copy of an advertisement published by Double R . . . contain[ing] depictions of the infringing products sold by Double R . . . as well as the confusingly similar model numbers . . . . The advertisement was a central part of the underlying litigation."  These

25

allegations and evidence are sufficient to establish the requisite causal connection between Double R's advertising activity and the injury suffered by Inter-Global.[10] See, e.g., Bigelow, 287 F.3d at 248 (finding that there was a causal connection between the alleged trade dress infringement and advertising activity where the "ads displayed the allegedly infringing trade dress" because, if the "copied trade dress created consumer confusion, the ads could be found to have contributed to such confusion."); Adolfo House, 165 F. Supp. 2d at 1341 (finding that the causal connection requirement was satisfied where the complaint alleged that the defendant advertised and promoted "knock-off" products); Bay Elec., 61 F. Supp. 2d at 619 (finding a causal connection where the defendants "were accused of trading on the goodwill of [the plaintiff] by marketing and selling knock-off circuit breakers"); Ben Berger & Son, Inc. v. Am. Motorist Ins. Co., No. 94-Civ.-3250, 1995 WL 386560, at *3 (S.D.N.Y. June 29, 1995) ("The injury caused by Berger's

---

[10]We note that the majority of the cases cited by the parties and discussed above were resolved in the context of an insurance company's failure to defend. In this case, however, Hyman asserts that Nationwide has a duty to indemnify. "[T]he duty to defend is broader than the duty to indemnify, in the sense that the insurer must defend even if the facts alleged are actually untrue, or the legal theories unsound." Adolfo House, 165 F. Supp. 2d at 1335 (citation omitted). In this case, the distinction is not relevant because the facts upon which we rely were established before the trial court. Thus, we make our determination based on that specific record. See id. at 1343 ("An insurer's duty to indemnify is ordinarily determined by analyzing the policy coverages based on the actual facts of the underlying case.") (citations omitted).

infringement of McKinney's trade dress is an advertising injury because it was Berger's advertising its similar products in its catalogue, in which McKinney's own products had previously been advertised, that diluted McKinney's distinctive trade dress and caused confusion as to the source of the products."); see also EKCO, 273 F.3d at 415 (finding no causal connection because "[n]othing in the . . . complaint suggests that it was concerned with . . . brochures or annual reports" and because "[t]he misappropriation offenses charged [in the] complaint were the physical reproduction and sale of a look-alike teapot"); Erie Ins. Group v. Sear Corp., 102 F.3d 889, 894 (7th Cir. 1996) ("Actions taken 'in the course of advertising' must involve actual, affirmative self-promotion of the actor's goods or services.").

In concluding on this record that there was a causal connection between the trade dress infringement and Double R's advertising activity, we need not address whether trade dress infringement by itself necessarily satisfies the causal connection requirement.[11]  Rather, we find simply that Double R's publication of

_____

[11]Several courts have found that "trademark and trade dress infringement inherently involve advertising activity." Poof Toy, 891 F. Supp. at 1235-36; see also Dogloo, 907 F. Supp. at 1391.  Those courts reason that, because the plaintiff in a trade dress infringement suit is required to show that the "dress is likely to cause confusion to the consumer or deceive the consumer as to the origin or manufacturer of the goods . . ., one must clearly advertise (announce to the intended customers) the mark or dress." Poof Toy, 891 F. Supp. at 1236; see also J.A. Brundage Plumbing

advertisements featuring artwork similar to the artwork in Inter-Global's ads and

promoting products substantially similar to Inter-Global's products designated by

similar model numbers to Inter-Global's model numbers is sufficient to create a

nexus between trade dress infringement and advertising. Therefore, the district

---

& Roto-Rooter, Inc. v. Massachusetts Bay Inc. Co., 818 F. Supp. 553, 558 (W.D. N.Y. 1993) ("Trademark or tradename infringement . . . necessarily involves advertising, or use, of the mark or name to identify the merchants's goods or services. Thus, . . . it is not possible to allege a claim for trademark, servicemark or trade name infringement without the infringing mark being used to identify the goods or services to the public."). That conclusion, however, is not one we have reached, and it is unnecessary to decide in this case whether trade dress infringement, without more, always involves advertising.

We do note, however, that this case is distinguishable from those cases which have found that claims based solely on patent infringement are not covered under the policy. See Novell, 141 F.3d at 988-90 ("A review of Ross' entire complaint demonstrates Ross alleged he developed a market for the StampIt software, only to have Novell/WordPerfect create an identical product and effectively close him out of the market. These allegations do not fit within the CGL policy language entitling plaintiff to a defense."); Simply Fresh Fruit, Inc. v. Continental Ins. Co., 94 F.3d 1219, 1222 (9th Cir. 1996) (finding that plaintiffs had not shown that they had been injured by the advertising when their complaint alleged solely misappropriation of "secret automated process for slicing fruit" because "patent infringement cannot occur in the course of an insured's advertising activities"). But cf. Frog, Switch, 193 F.3d at 750 n.8 (stating that courts, such as the Ninth Circuit in Simply Fresh, 94 F.3d at 1222, "that reason that the injury could have taken place without the advertising, are misstating the relevant tort liability principles, which ask whether the advertising did in fact contribute materially to the injury"). Unlike those cases, the infringement in this case was connected directly with the advertising through the model numbers and a willful effort to make the product appear similar to Inter-Global's product.

court erred in finding that the jury verdict for trade dress infringement was not an "advertising injury" covered under the insurance policy.

### III.

Having determined that the Lanham Act violation in this case falls within the policy's "advertising injury" coverage, we examine appellee's final argument that coverage nonetheless is barred by the policy's "knowledge of falsity" exclusion. That exclusion bars coverage for advertising injuries "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." The district court found that, even if there was an advertising injury in this case, the jury's determination that Double R acted "willfully" invoked that exclusion and thereby barred Hyman's claim. Because, however, the term "falsity" as used in the exclusion is ambiguous and therefore must be construed narrowly under Florida law, the exclusion does not bar coverage in this case.[12]

_____

[12]Appellee also argues that two other exclusions bar coverage in this case. The district court did not reach these issues, and they do not warrant much discussion on appeal. First, Nationwide argues that the claim is precluded by the exclusion barring claims for "advertising injury . . . [a]rising out of oral or written publication of material whose first-publication took place before the beginning of the policy period." While Double R acknowledged producing the infringing product beginning in 1989, Nationwide has not submitted to the court an advertisement or catalog published prior to the policy's effective date of December 10, 1992. Instead, it relies on testimony by one of Double R's customers that it was "more than likely" that the advertisements ran

The term "falsity" is not defined in the policy and, in this context, has not been the subject of any relevant case law. It is not, however, an uncommon or arcane term and, in common parlance, "false" means "untrue" or failing to correspond to a set of known facts. See, e.g., Webster's Third New International Dictionary 819 (1986) (defining false to mean "not corresponding to truth or reality: not true"); 5 Oxford English Dictionary 572-73 (2d ed. 1989) (defining false to mean "[e]rroneous, wrong[; m]endacious, deceitful, treacherous[; s]purious, not genuine"); Black's Law Dictionary 618 (7th ed. 1999) ("Untrue . . . Deceitful; lying").

---

in 1989 or 1990, a statement by Double R's principal, Warren Levenson, that the first advertisement "probably" was published in 1989 or 1990, and testimony by one of the owners of Inter-Global that he knew about the advertisement "at some point before the end of 1990." These assertions are insufficient to to foreclose any question of material fact on the issue and, therefore, do not warrant the entry of summary judgment in favor of Nationwide. See, e.g., Dogloo, 907 F. Supp. at 1391 ("[B]ased on the record before it, the Court cannot say that any advertising published prior to the policy period caused the type of injury alleged . . ..").

Second, Nationwide says that the claim is barred by the exclusion precluding coverage for "advertising injury . . . [a]rising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured." The Lanham Act, however, is not a penal statute. Even a willful violation, as occurred in this case, would not give rise to a criminal prosecution. Accordingly, coverage for the trade dress infringement claim is not precluded by this exclusion. Cf. Poof Toy, 891 F. Supp. at 1237 ("[T]his Court finds no reference to the violation of any penal statute or ordinance.").

Those definitions, however, do not help us determine what sort of actions or statements may be said to be false in this context. This case would be easily resolved if any of the information or assertions in Double R's advertisements were "untrue" in the sense that they did not correspond to a set of known facts. If for example, Double R had asserted that its bases were manufactured by Inter-Global, that statement clearly would be false and any advertising injury resulting therefrom would be excluded. See, e.g., Wackenhut Servs., Inc. v. Nat'l Union Fire Ins. Co., 15 F. Supp. 2d 1314, 1321 (S.D. Fla. 1998) (finding that there was no duty to defend slander or disparagement claims where the defendant intentionally made false statements).

In this case, however, there are no such assertions. Rather, Double R was found to have created the likelihood of consumer confusion -- the likelihood that consumers would think that its products either were made by Inter-Global, were identical to Inter-Global's, or were in some way endorsed by, or affiliated with, Inter-Global. See Univ. of Fla., 89 F.3d at 777 n.7 ("[T]he touchstone test for a violation of § 43(a) is the 'likelihood of confusion' resulting from the defendant's adoption of a trade dress similar to the plaintiff's.") (quoting Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 831-32 (11th Cir. 1982)). Double R created that likelihood of confusion by designing products similar in appearance

31

to Inter-Global's products, designating those products with model numbers similar to Inter-Global's numbers, and marketing the products with those model numbers in advertisements similar to Inter-Global's ads. Notably, the record does not reflect any statements of fact or direct misrepresentations regarding the origin or function of Double R's products.

Indeed, the jury found specifically that Double R did not engage in false advertising under the Lanham Act, which would have required a showing that Double had made a false or misleading statement of fact about its products.[13] Moreover, we are not persuaded that the "knowledge of falsity" exclusion necessarily was invoked by the jury's finding that Double R acted willfully. With respect to willfulness on the Lanham Act claims, the jury was instructed that "[a]n act is done willfully if done voluntarily and intentionally and with the specific intent to commit such an act." That definition does not in any way determine whether Double R's statements or advertisements were "false."

---

[13]To succeed on a false advertising claim under the Lanham Act, a plaintiff must show that: (1) the defendant made false or misleading statements about its product in an advertisement; (2) the advertisement actually deceived, or had the tendency to deceive, the targeted audience; (3) the deception is material; (4) the defendant's advertised product traveled in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false or misleading advertisements. See Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc., 915 F. Supp. 360, 364 (S.D. Fla. 1996) (citations omitted).

Under these circumstances, we think it is unclear whether the "written material" giving rise to the "advertising injury" should be described as "false." See, e.g., Interface, Inc. v. Standard Fire Ins. Co., No. 99-CV-1485, 2000 WL 33194955, at *5 (N.D. Ga. Aug. 15, 2000) ("With respect to the 'knowledge of falsity' exclusion, defendants contend that [the insured] wilfully and deliberately infringed [the] copyright.  Knowledge of falsity, as a layman would read it, has nothing to do with copyright infringement.  Nor is it an element of a claim for copyright infringement.") (citation omitted).  We recognize, of course, that a court could construe the term "false" to encompass conduct or statements arguably giving rise to a false or misleading impression.  Such a definition, however, is significantly broader than one including only direct assertions of untrue facts, and we find it no more plausible.

As we've discussed, the most common use of the term "false" is to mean "untrue" or failing to correspond to a set of known facts -- not creating a false impression or, maybe, only customer confusion.  According the term the broadest definition would undermine the clear directive from Florida law that ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured.  See Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co., 711 So.2d 1135, 1138 (Fla. 1996).  "In fact, exclusionary clauses are construed even

33

more strictly against the insurer than coverage clauses." Auto-Owners, 756 So.2d

at 34 (citing State Comprehensive Health Ass'n v. Carmichael, 706 So.2d 319, 320

(Fla. Dist. Ct. App. 1997)).

Because we must construe the exclusion narrowly and in favor of coverage,

we find that Double R's actions were not "false" inasmuch as they did not amount

to direct assertions of untrue facts.[14]  Therefore, the exclusion does not preclude

coverage for the jury verdict at issue in this case.

IV.

_____

[14]Finally, we note that this case is plainly different from Florida v. Russ, 778
So.2d 414 (Fla. Dist. Ct. App. 2001).  In that criminal case, the City Commission
authorized Russ, the City Commissioner, to spend $600 to purchase toys for charity.
The City Commission made out a check to Toys-R-Us in that amount and gave it to
Russ to purchase the toys.  At Toys-R-Us, he used the check to purchase $450 worth
of toys for charity and $150 worth of merchandise for another customer.  The other
customer, in turn, gave Russ $100 in cash.  Based on those facts, Russ was convicted
of committing "official misconduct," for "knowingly falsifying, or causing another
to falsify, any official record or official document."  Fla. Stat. Ann. § 839.25.  Russ's
negotiation of the check constituted an actual misrepresentation of fact -- namely, that
he had spent the entire $600 on toys for charity.  In this civil case, on the other hand,
there is not necessarily such a misrepresented fact underlying Double R's designation
of its products by particular model numbers.  Rather, the jury found simply that
Double R intended to create confusion in the minds of the potential buyers.  Similarly,
in A.J. Sheepskin & Leather Co., Inc. v. Colonia Ins. Co., 709 N.Y.S.2d  82 (N.Y.
App. Div. 2000), although the court found that the insurer had no duty to defend
because there was "no reason to suppose that there was a reasonable possibility that
liability in that [trademark infringement] action might be premised on unintentional
or unknowing conduct not embraced by [the] exclusion," it did not address this
question.

34

In sum, the district court erred in determining that the trade dress infringement that occurred in this case was not an "advertising injury" covered under the insurance policy issued by Nationwide. Similarly, it erred in concluding that the "knowledge of falsity" exclusion precluded coverage. We are satisfied that coverage under the policy does exist for the jury award, and, accordingly, we reverse the entry of summary judgment in favor of Nationwide and remand this case to the district court with instructions to grant Hyman's motion for summary judgment.[15]

REVERSED and REMANDED.

---

[15]As a result of this disposition of the appeal, we also deny Nationwide's motion for appellate attorneys' fees.