[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-12938

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 12, 2012
JOHN LEY
CLERK

D.C. Docket No. 0:08-cv-61473-DLG


MID-CONTINENT CASUALTY COMPANY,
a foreign corporation,

                    Plaintiff - Counter Defendant - Appellant - Cross-Appellee,

                    versus

GUITREE BASDEO,

                                        Defendant - Appellee - Cross-Appellant,

SOUTHGATE GARDENS CONDOMINIUM ASSOCIATION, INC.,

                                                            Defendant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 12, 2012)

Before BARKETT, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Appellant/Cross-Appellee Mid-Continental Casualty Company ("Mid-Continent") filed this declaratory action against Appellee/Cross-Appellant Guitree Basdeo, as well as Southgate Gardens Condominium Association, Inc. ("Southgate") and First State Development Corporation ("First State"). Mid-Continent seeks a declaration that it had no duty to defend or indemnify its insured, First State, in the state court actions brought by Basdeo and Southgate in connection with hurricane repair work performed by First State. In addition, it seeks declarations that even if there is coverage under the policy issued to First State, its liability is limited. The district court denied Mid-Continent's motions for summary judgment, and granted in part and denied in part the cross-motion for summary judgment filed by Basdeo.[1] After careful review, we affirm the district court's judgment.

## I.

This case arises from the aftermath of Hurricane Wilma, which in October 2005 struck South Florida and damaged some of Southgate's buildings. To repair the damage, Southgate hired building contractor First State. At that time, First

---

[1] After the magistrate judge issued her recommendation, but before the district court's final order, Mid-Continent and Southgate settled their dispute.

State was insured by Mid-Continental.

On or about November 1, 2005, First State completed "tarping" on the buildings. Then, on November 11, 2005, First State entered into a contract with Southgate to remove and replace the roofs of the Southgate buildings, remove debris, and make interior repairs to the individual units.

As it turned out, the tarps placed by First State were either inadequate or did not stay in place. As a result, water entered the unit of a resident, Wane Bogosian, damaging it. Further, when it attached the tarps, First State caused holes to be made in the roofs of buildings at Southgate, leading to additional interior damage. First State also left the mansards[2] open. Finally, the peeled-back condition of the roofing left the interior of the buildings exposed to the elements, and some rain entered through those openings.

On September 11, 2006, Bogosian presented to Mid-Continent a claim for damages allegedly stemming from First State's work. Shortly after, Mid-Continent opened a claim for Bogosian and began to investigate. What followed is ably set forth in the magistrate judge's report,[3] so is only briefly summarized

---

[2] A "mansard" refers to a type of roof, which has two slopes on all sides, but with the lower slope steeper than the upper one.

[3] The district court adopted the magistrate judge's report and recommendation in its entirety.

here.

From the start, Mid-Continent had difficulty getting First State to cooperate fully in the investigation. By the end of 2006, Southgate had fired First State and had to hire three other contractors to finish the exterior and interior repairs. Then, on or about July 18, 2007, Basdeo and other residents of Southgate filed a lawsuit against First State in Florida state court. Basdeo contended that First State damaged her roofs, the interior of her unit, and her personal possessions. Although named as a defendant in that action, First State never notified Mid-Continent of the suit, never requested that Mid-Continent provide it with a defense, and was generally unresponsive to Mid-Continent's attempts to contact it. Nonetheless, on August 3, 2007, Mid-Continent learned that a suit may have been filed against First State, and a few days later sent a letter to First State asking for further information and reiterating First State's contractual obligation to cooperate.

On September 19, 2007, Southgate also filed suit against First State. On October 3, 2007, Mid-Continent received a copy of the Basdeo lawsuit from Basdeo's attorney and was further informed that Basdeo's motion for default had been granted. Again, despite various attempts to communicate with First State, Mid-Continent had no success. By early April 2008, the state court had entered a

final default judgment against First State in both the Basdeo and Southgate cases. On April 17, 2008, Mid-Continent formally informed First State of its decision to deny coverage for both the Basdeo and Southgate cases. In September 2008, Mid-Continent filed this declaratory judgment action.

II.

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179, 1185 (11th Cir. 2002). Thus, summary judgment is appropriate where the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Id. "In making this assessment, we view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion, and resolve all reasonable doubts about the facts in favor of the non-movant." Id. (quotation marks and alterations omitted).

In a diversity suit such as this, we apply the substantive law of Florida, the forum state. See generally Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938). Under Florida law, interpretation of provisions of an insurance policy is a question of law, which we review de novo. See James River Ins. Co. v. Ground Down Eng'g, 540 F.3d 1270, 1274 (11th Cir. 2008). We interpret ambiguities in

5

the insurance contract against the insurer and in favor of the insured. <u>Garcia v. Fed. Ins. Co.</u>, 969 So. 2d 288, 291 (Fla. 2007).

III.

The first issue we address is whether Mid-Continent may deny coverage based on the fact that First State never requested a defense. Because we conclude Mid-Continent is essentially asserting a coverage defense, we agree with the district court that Mid-Continent is estopped under the Florida Claims Administration Statute (FCAS), Fla. Stat. § 627.426, from denying coverage on this basis.

"[T]he term 'coverage defense,' as used in [the FCAS], means a defense to coverage that otherwise exists." <u>AIU Ins. Co. v. Block Marina Inv., Inc.</u>, 544 So. 2d 998, 1000 (Fla. 1989). We agree with the district court that that is precisely what Mid-Continent's argument for denying coverage here amounts to. In Count I of its Amended Complaint, Mid-Continent alleges that it had "no duty to defend or indemnify First State" absent a request from First State to defend. In other words, Mid-Continent is not arguing that the loss suffered falls outside the scope of its coverage, but rather, that "other factors justify not fulfilling the contract," thereby relieving it of the obligation to indemnify First State. <u>Mid-Continent Cas. Co. v. King</u>, 552 F. Supp. 2d 1309, 1316 (N.D. Fla. 2008). Undeniably, this is a

6

coverage defense.  See id.

The FCAS imposes two requirements on any liability insurer that seeks to assert a coverage defense.  First, "[w]ithin 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense [must be] given to the named insured by registered or certified mail sent to the last known address of the insured or by hand delivery."  Fla. Stat. § 627.426(2)(a).  Second, "[w]ithin 60 days of compliance with [§ 627.426(2)(a)] or receipt of a summons and complaint naming the insured as a defendant, whichever is later, but in no case later than 30 days before trial, the insurer" must do one of three things.  Id. § 627.426(2)(b).  It must (1) give written notice to the named insured of its refusal to defend the insured, (2) obtain a non-waiver agreement from the insured, or (3) retain independent counsel which is mutually agreeable to the parties.  Id.  Failure to comply with both requirements results in the waiver of the coverage defense.

Here, the record shows that Mid-Continent did not comply with both of these conditions.  On August 3, 2007, Mid-Continent first received notice of claims filed against First State that would fall under First State's insurance policy. On August 8, 2007, Mid-Continent sent First State a reservation-of-rights letter. In the letter, Mid-Continent stated that it was aware of a "lawsuit filed by the

7

individual unit owners of Southgate Condo Association . . . against First State Development Corporation." Mid-Continent further advised First State that "in the event First State Development Corp. is looking for Mid-Continent Casualty Company to assist in the defense of this suit, it is imperative that immediately upon receipt of said suit that you forward the suit to Mid-Continent Casualty Company as soon as possible." Mid-Continent never received any kind of response. Then, on October 3, 2007, Basdeo's attorney sent Mid-Continent a copy of the state lawsuit against First State and informed Mid-Continent that Basdeo's motion for default had been granted.

Having received no response to its August 8, 2007 letter and having learned that a motion for default had already been granted against First State, Mid-Continent "should have known" of its coverage defense relating to First State's failure to request a defense on or shortly after October 3, 2007. At that point, Mid-Continent was therefore obligated to comply with both conditions of Fla. Stat. § 627.426(2) in order to preserve its coverage defense based on First State's failure to request a defense. Yet, there is no evidence that Mid-Continent sent First State a notice of its reservation of rights within thirty days of the time it should have known of its coverage defense. Thus, we conclude that Mid-Continent is estopped from denying coverage based on First State's failure to

request a defense.

Alternatively, assuming arguendo that Mid-Continent knew of its coverage defense at the time it sent its August 8, 2007 letter and that the letter adequately expressed Mid-Continent's reservation of rights, Mid-Continent failed to comply with the second requirement of the FCAS because it did not give written notice of its refusal to defend First State within sixty days of October 3, 2007, the date it received the Basdeo complaint naming First State as a defendant. See Fla. Stat. § 627.426(2)(b).[4]

## IV.

The second issue we address is whether Mid-Continent may deny coverage based on First State's failure to cooperate pursuant to the terms of the insuring agreement. Under Florida law, an insurer may under certain circumstances deny coverage based on the insured's failure to cooperate. Specifically, coverage may be denied so long as (1) the lack of cooperation was material, (2) the insurer "exercised diligence and good faith in bringing about the cooperation of its insured" and itself "complied in good faith with the terms of the policy," and (3)

---

[4] In reaching this holding, we decline to specify the conditions under which Mid-Continent had a duty to defend First State. Rather, we hold only that, to the extent Mid-Continent argues it has no obligation to indemnify First State because of First State's failure to request a defense, it waived this coverage defense when it failed to comply with the FCAS.

9

the lack of cooperation substantially prejudiced the insurer. <u>Ramos v. Nw. Mut. Ins. Co.</u>, 336 So. 2d 71, 75 (Fla. 1976). Because this is a coverage defense, it is subject to the requirements of Fla. Stat. § 627.426(2). Concluding that Mid-Continent failed to comply with the FCAS, we hold that Mid-Continent is also estopped from asserting First State's failure to cooperate as a coverage defense.

Mid-Continent denies that it "knew" of its coverage defense related to First State's failure to cooperate when it sent its August 8, 2007 reservation-of-rights letter. Even assuming that were true, there can be no doubt that Mid-Continent either "knew or should have known" of the failure-to-cooperate coverage defense on or shortly after October 3, 2007. As we have said, that was the date Basdeo's attorney provided Mid-Continent with a copy of the lawsuit against First State and informed it that Basdeo's motion for default had been granted. At that time, Mid-Continent was also well aware that First State had never responded to its August 8, 2007 letter. Consequently, by October 3, 2007, First State had exhibited a failure to cooperate that appeared to be material, this failure to cooperate was continuing despite Mid-Continent's effort to bring about First State's cooperation, and the failure to cooperate had put Mid-Continent at high risk of being substantially

prejudiced.[5]  Thus, the record unambiguously demonstrates that Mid-Continent "should have known" of that defense by or shortly after October 3, 2007.  That, in turn, triggered its obligation under the FCAS to notify First State within thirty days of its reservation of rights to assert the failure-to-cooperate coverage defense.  However, as Mid-Continent acknowledges, it did not send a letter notifying First State that it was reserving its right to assert this defense until February 29, 2008.  As this letter came far after the thirty-day deadline had expired, we conclude that Mid-Continent is estopped from denying coverage based on First State's failure to cooperate.

## V.

The third issue we address is the number of "occurrences" under the policy.  Both parties agree that the faulty tarping performed by First State constituted one occurrence.  However, they disagree about whether the damages resulting from the

---

[5] Indeed, Mid-Continent argues that the "sum and substance of the 'extent' of First State's cooperation" was the October 10, 2006 meeting between adjuster Lydia Hollander and First State CEO David Perry.  In other words, according to Mid-Continent, for nearly a year prior to October 3, 2007, First State showed no evidence of cooperation.  Mid-Continent emphasizes in particular that "First State failed to notify Mid-Continent of the [Basdeo] lawsuit or forward a copy of the complaint to Mid-Continent, as it was required to do under the policy.  Moreover, First State failed to respond to the August 8, 2007, reservation of rights letter sent by Mid-Continent.  In further support of its argument that First State breached its duty to cooperate and caused Mid-Continent substantial prejudice, Mid-Continent points out that "First State failed to notify Mid-Continent that default had been entered against it in the Basdeo lawsuit on August 22, 2007," and that "Mid-Continent could not appoint counsel to answer the complaints and prevent defaults from being entered."  By October 3, 2007, all of these things were evident to Mid-Continent.

roof repair work performed by First State under contract constituted a single occurrence or two separate occurrences. Because we agree with the district court that the damages resulting from the contract work constituted two occurrences, we hold that—together with the tarping—there were a total of three occurrences under the policy.

The term "occurrence" is defined under the policy as "an accident, including continuous or related exposure to substantially the same general harmful conditions." In interpreting this term, Florida adopts the "cause theory," under which "[i]t is the act that causes the damage, which is neither expected nor intended from the standpoint of the insured, that constitutes the 'occurrence.'" Koikos v. Travelers Ins. Co., 849 So. 2d 263, 271 (Fla. 2003). The Florida Supreme Court has further noted that "the inclusion of the 'continuous or repeated exposure' language does not restrict the definition of 'occurrence' but rather expands it by including ongoing and slowly developing injuries, such as those in the field of toxic torts." Id. at 268 (emphasis omitted).

Mid-Continent argues that the damages caused in connection with First State's work on the flat top portion of the roofs are not a separate occurrence from the damages caused in connection with First State's work on the mansards. Mid-Continent offers two reasons in support. First, it argues that because the work on

12

both the mansards and flat top portion of the roofs "was performed pursuant to the same contract," the real cause of the damages was First State's breach of its contract with Southgate, which should be understood as a singular occurrence. Second, Mid-Continent contends that the fact that there was a "proximate causal link" between the work on the mansards and work on the flat top portion of the roofs further justifies holding there was just one occurrence under the policy.

Neither argument is persuasive. Mid-Continent's first rationale reaches too far, essentially redefining an "occurrence" to mean all damages caused by the breach of a contract. If Mid-Continent had intended all such damages to constitute a single occurrence under the insurance policy, "it could have drafted clear policy language to accomplish that result." Koikos, 849 So. 2d at 272. However, it did not do so, and in the absence of clearer language we decline to construe the term "occurrence" against the insured in such a one-sided way.[6]

Mid-Continent's second rationale is equally unavailing because it makes no distinction between the roof repair work assigned to First State, on the one hand, and the deficient work actually performed that resulted in damages, on the other.

_____

[6] Claiming that the Florida Supreme Court's reasoning in Koikos should not be applied strictly in this context, Mid-Continent relies heavily on the older lower appellate court case of Southern International Corp. v. Poly-Urethane Industries, Inc., 353 So. 2d 646 (Fla. 3d DCA 1977). But Poly-Urethane is distinguishable in several respects, most notably in that the insured in that case engaged in a single type of simple activity several times, see id. at 647–48, whereas here First State undertook substantially different types of work on different parts of the building.

13

According to Mid-Continent, because installing a new roof required opening up the mansards, the damages caused in connection with the negligent work on the mansards may be attributed to the other roof repair work assigned to First State. Thus, there was just one occurrence. But this is simply wrong. Even assuming that Florida law allows multiple events to constitute a single occurrence upon a showing of proximate causation, Mid-Continent never demonstrates the requisite "proximate causal link." It is not enough to show that the work on the flat top portion of the roofs was a but-for cause of the damages resulting from the work on the mansards. For its theory to make sense, Mid-Continent also has to show that, by leaving the mansards open, the damages resulting from the deficient work on the flat top portions of the roof were reasonably foreseeable. Cf. McCain v. Fla. Power Corp., 593 So. 2d 500, 502 (Fla. 1992) (explaining that the "proximate causation element" in negligence suits "is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred"). This it cannot do.

Consequently, we reject Mid-Continent's argument that the damages resulting from the roof repair work performed by First State under the contract constituted just a single occurrence under the insurance policy. We instead affirm the district court's conclusion that three occurrences in total transpired: one in

14

connection with the tarping and two in relation to the contracted roof repairs.

VI.

The final issue we address is the coverage limit that applies under the insurance policy.  Both parties argue that the district court erred in ruling that a $3 million coverage limit applies to Basdeo's claims.  On the one hand, Mid-Continent argues that the district court's error lay in finding there were three occurrences under the policy, when in fact there were just two occurrences, each subject to a $1 million per occurrence limit.  On the other hand, Basdeo argues on cross-appeal that the district court erred because it failed to note that an occurrence falling under the General Aggregate Limit may also constitute an occurrence under the Designated Construction Project General Aggregate Limit.  According to Basdeo, this means that a $4 million limit should apply.

Neither argument persuades us.  For the reasons set forth earlier, we disagree with Mid-Continent's assertion that there were only two occurrences.  Premised as it is on this claim, Mid-Continent's argument therefore fails.

Basdeo's argument also fails on its face.  By imputing a total of $2 million of coverage to a single occurrence, it ignores the policy's clear $1 million "Each Occurrence Limit."  Beyond this, as Mid-Continent points out in its brief, the two general aggregate limits

15

do not in and of themselves create additional coverage for a single occurrence. They are both unambiguously <u>caps</u> on coverage. Simply because the policy provides that payments made under the [Designated Construction Project General Aggregate] Limit do not reduce the [General Aggregate] Limit does not mean that a claimant is entitled to cumulate coverage for a single occurrence under both categories if that occurrence happens to fit within both categories. Notably, Basdeo does not and cannot provide any support for the proposition that policy limits are expanded under such circumstances.

As neither side has shown reversible error in the district court's judgment regarding the coverage limit that applies to Basdeo's claims, we must affirm.

**AFFIRMED.**