[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 13, 2011
JOHN LEY
CLERK

No. 11-10814
Non-Argument Calendar

_____

D.C. Docket No. 9:09-cv-80554-KAM

OFFICE DEPOT, INC.,

Plaintiff - Appellant,

versus

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

Defendant - Appellee,

AMERICAN CASUALTY COMPANY OF READING, PA,

Intervenor Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 13, 2011)

Before WILSON, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Office Depot, Inc. ("Office Depot") appeals the district court's grant of summary judgment in favor of National Union Fire Insurance Company ("National Union") and American Casualty Company ("American") (collectively, "carriers"). Office Depot filed for declaratory judgment, seeking coverage under its insurance policy for more than $20 million in legal fees that it incurred while responding to Securities and Exchange Commission ("SEC" or "the Commission") inquiries. The National Union policy—providing "organization insurance," *inter alia*—carried $25 million worth of insurance for covered claims, subject to a $2.5 million retention[1] and a 20% co-insurance provision. The American insurance policy used identical policy language and provided coverage for losses above $25 million.[2] The district court determined that most of the legal fees were not covered by the policy and granted summary judgment in the carriers' favor. After extensive review of the parties' briefs, the insurance policy, and the record, we affirm.

## I.

The following dates and occurrences are relevant to the disposition of this

---

[1] The retention clause of the contract makes clear that the carriers are responsible only for losses in excess of the first $2.5 million.

[2] Because the policies issued by National Union and American are identical in all relevant parts, we will refer to a singular "policy" throughout this opinion.

appeal:

> *June 2007*—An article on the Dow Jones Newswire reported that Office Depot may have violated federal securities laws by selectively disclosing nonpublic information.

> *July 11, 2007*—Office Depot forwarded a copy of the article to the carriers as "notice of circumstances" that a claim might be filed against it in the future.

> *July 2007*—Office Depot received an internal letter alleging problems with various accounting practices. That prompted an independent review, which included the use of outside legal counsel and forensic accountants.

> *July 17, 2007*—The SEC sent Office Depot a letter advising it that the Commission would begin conducting an inquiry into Office Depot to determine whether Office Depot had violated securities laws.[3]

> *August 6, 2007*—The SEC asked Office Depot to produce any internal letters regarding accounting irregularities so that it could determine whether securities laws had been violated.

> *October 29, 2007*—Office Depot announced the findings of its internal review, concluding that certain financial statements would have to be revised and others delayed. It self-reported each problem to the SEC.

> *November 2007*—Two shareholder derivative lawsuits and two securities lawsuits were filed against Office Depot and various officers and directors in the federal district court for the Southern District of Florida.

> *January 10, 2008*—The SEC issued a formal order of investigation. It indicated that the Commission had information suggesting that Office Depot had broken securities laws. In the two years following the order of investigation, the SEC issued subpoenas to various officers and directors,

---

[3] Shortly after receipt, Office Depot forwarded the letter to the carriers.

and "Wells Notices"[4] recommending civil action against three officers.

*December 2009*—The SEC filed a formal complaint, and Office Depot announced that it had reached a settlement agreement with the SEC staff.

II.

The standards we use for summary judgment and Florida insurance policy interpretation are well settled.

> We review a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court. Thus, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .
>
> Further, we are required to apply Florida law to determine the meaning of the insurance policy. Thus, we look at the policy as a whole and give every provision its full meaning and operative effect. We start with the plain language of the policy, as bargained for by the parties. If that language is unambiguous, it governs. Under Florida law, however, if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous, and must be interpreted liberally in favor of the insured and strictly against the

---

[4] "'A Wells Notice notifies the recipient that the SEC's Enforcement Division is close to recommending to the full Commission an action against the recipient and provides the recipient the opportunity to set forth his version of the law or facts.'" *SEC v. Internet Solutions for Bus., Inc.*, 509 F.3d 1161, 1163 n.1 (9th Cir. 2007) (quoting *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 279 (D. Conn. 2005)).

drafter who prepared the policy.[5]

*Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1185–86 (11th Cir. 2002) (alteration omitted) (citations omitted) (internal quotation marks omitted). We keep these principles in mind when evaluating the instant insurance policy.

### III.

Office Depot presents four arguments for review. We address each below.[6]

### A.

Office Depot contends that the first insuring provision under the "Organization Insurance" section, which provides coverage for Losses[7] "arising from" Securities Claims, covers all of the Defense Costs incurred after Office Depot received its first SEC letter on July 17, 2007.[8] It contends that the

---

[5] The record reflects that the parties disputed whether Florida or New York contract law applied in proceedings before the district court, but that opinion indicates that the parties stipulated to the district court's application of Florida law, agreeing that there was no material difference between the two. Neither party meaningfully briefed this issue on appeal. Accordingly, we will assume Florida law applies and deem any challenge on this point abandoned. *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (per curiam).

[6] We do not address Office Depot's arguments in the order that they are briefed. Rather, we address them in the order that the language at issue appears in the policy. This allows for a better understanding of the structure of the instant policy.

[7] Certain terms within the insurance policy are defined within it. Accordingly, we will capitalize these terms to denote that they have a specific meaning in this appeal. We define some of these terms throughout the opinion.

[8] The carriers concede that the policy covers the costs incurred in responding to the securities lawsuits filed by November 2007.

definition of Securities Claim in the policy does not explicitly exclude costs associated with SEC investigations, and, even if it does, the "carve-back" language that completes the definition restores coverage.

Two policy provision are relevant to the disposition of this issue. First, the insuring agreement language provides:

> COVERAGE B: ORGANIZATION INSURANCE
> (i) *Organization Liability*. This policy shall pay the Loss[9] of any Organization arising from a Securities Claim made against such Organization for any Wrongful Act of such Organization. . . .

The policy defines a Securities Claim as:

> a Claim*, other than an administrative or regulatory proceeding against, or investigation of an Organization,* made against any Insured:
>
> (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities . . . ; or
>
> (2) brought derivatively on the behalf of an Organization by a security holder of such Organization.
>
> Notwithstanding the foregoing, the term "Securities Claim" *shall include an administrative or regulatory proceeding against an Organization,* but only if and only during the

---

[9] "Loss" encompasses "Defense Costs," which includes reasonable and necessary legal fees and costs "resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against an Insured . . . ."

6

> time such proceeding is also commenced and continuously maintained against an Insured Person.[10]

(emphasis added).

Office Depot argues that "[t]he Policy does not contain *any* definition of what is or is not an 'administrative or regulatory proceeding.' It certainly does not contain clear and unmistakable language excluding coverage for SEC investigations." Therefore, Office Depot argues that the policy should be read liberally and coverage should begin with the issuance of the SEC letter in July 2007.

While it is true that the policy fails to define "administrative or regulatory proceedings," it does not follow that Office Depot is entitled to coverage for all expenses incurred after receiving the SEC letter. The initial portion of the Securities Claim definition creates a clear disjunctive through the use of "or." Specifically, it eliminates coverage for two types of potential Securities Claims: (1) Claims in the form of administrative or regulatory proceedings against Office Depot and (2) Claims in the form of an administrative or regulatory investigation of Office Depot. The carve-back provision restores coverage for the former under certain circumstances. But it does not restore for the latter. Since we give

---

[10] The district court referred to this final sentence of the Securities Claim definition as the "carve-back" clause. For convenience, we use the same terminology.

meaning to each phrase within a policy, *see Hyman*, 304 F.3d at 1186, that omission is dispositive for our interpretation of the policy's language on this point. Because the SEC's requests for voluntary cooperation in furtherance of its pre-suit discovery constituted an "investigation" rather than an "administrative or regulatory proceeding," Office Depot's expenses incurred after the receipt of the SEC letters are excluded from coverage. Accordingly, the district court did not err on this ground.

## B.

Office Depot next contends, briefly, that the insuring agreement's indemnification of Insured Persons covers the losses it incurred as a result of the SEC's investigation.[11]

The relevant policy language states:

> COVERAGE B: ORGANIZATION INSURANCE
> . . .
> (ii)  *Indemnification of an Insured Person*. This policy shall pay the Loss of an Organization arising from a Claim made against an Insured Person (including an Outside Entity Executive) for any Wrongful Act of such Insured Person, but only to the extent that such Organization has indemnified such Insured Person.

A Claim is defined, in relevant part, as:

---

[11] The carriers acknowledge that the SEC's issuance of subpoenas, between September 2008 and February 2009, constituted covered Claims.

8

(2)    a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or

(3)    a civil, criminal, administrative or regulatory investigation of an Insured Person:

     (i)    once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced; or

     (ii)    in the case of an investigation by the SEC or a similar state or foreign government authority, after the service of a subpoena upon such Insured Person.

Office Depot seems to contend that the SEC letters it received starting in 2007 were sufficient to trigger a Claim as defined by the policy. Generally, in these letters, the SEC asked Office Depot to preserve certain documents and requested that several individuals provide testimony. Office Depot argues that those letters are sufficient to constitute notice that Insured Persons could have proceedings commenced against them.

The letters, however, only broadly request information to assist the SEC in determining whether Office Depot committed securities violations. They do not allege that violations have occurred or identify specific individuals that could be

9

charged in future proceedings. In contrast, the Wells Notices, which the carriers concede trigger a Claim, state that the SEC staff "intends to recommend that the Commission bring a civil injunction against [named individual], alleging" that he or she violated specific securities laws. The Wells Notices create a Claim because an "Insured Person is identified in writing by [the SEC] as a person against whom" "a civil . . . proceeding for . . . injunctive relief" may be commenced by "service of a complaint or similar pleading" or by the "filing of a notice of charges." After review of the policy and the correspondence at issue, we conclude that correspondence to which Office Depot referred does not trigger a Claim under the relevant policy definition.

## C.

Office Depot next posits that the district court erred in concluding that the policy covered only Defense Costs incurred after a Claim is made against the Insured. Specifically, it contends that there is no "temporal limitation in this definition barring coverage for costs of investigating an anticipated claim or actual claim." Office Depot's argument is based mostly on the practical realities of securities litigation. Regarding the text, however, it argues that "[t]here is no 'but only after the Claim is actually made' exclusion or other temporal limitation in [the definition of Defense Costs] barring coverage" for pre-Claim expenses.

10

The policy defines Defense Costs as "reasonable and necessary fees, costs, and expenses consented to by the Insurer . . . resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against an Insured . . . ."

We conclude that the text unambiguously limits Defense Costs to those costs incurred after a Claim has been made. Investigation of a Claim necessitates that a Claim exists to investigate. While we agree with Office Depot that the policy does not explicitly exclude the investigation costs for potential claims, we also realize that such a step is not necessary. The plain language demonstrates that the costs must "result[] solely from" a Claim. As the operative facts at issue in this argument do not create a Claim, the costs preceding the Claim cannot "result from" the Claim. Accordingly, the district court correctly concluded that expenses constituted only Defense Costs within the meaning of this policy if they were incurred after a Claim was made against Office Depot.

D.

We now address Office Depot's final, and most detailed, argument. It revolves around policy Section 7, entitled "Notice/Claim Reporting Provisions." It declares that the Insured must give the carrier notice of possible claims that might arise. It provides, in relevant part:

11

(a) An Organization or an Insured shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured . . . as soon as practicable: (i) after the Named Entity's Risk Manager or General Counsel . . . first becomes aware of the Claim; or (ii) the Crisis commences, but in all events no later than either:

    (1) the end of the Policy Period . . . ; or

    (2) within 30 days after the end of the Policy Period . . . as long as such Claim was first made against an Insured within the final 30 days of the Policy Period . . . .

(b) If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then a Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based on or attributable to the facts alleged in the Claim for which such notice has been given, . . . shall be considered related to the first Claim and made at the time such notice was given.

(c) *If during the Policy Period . . . an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances*, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, *then a Claim which is subsequently made against such Insured* and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, *shall be considered made at the*

12

*time such notice of such circumstances was given.*

(emphasis added).

The crux of Office Depot's argument is that Section 7 allows the Claim to "relate back" to the date the insured filed the original notice of circumstances such that any costs incurred between the notice of circumstances and the date a Claim was made so long as they are both based on the same facts. Office Depot contends that the district court erred in ruling that Section 7 does not allow it to recover Defense Costs incurred in connection with the investigation following Office Depot's submission of the notice of circumstances, which it filed immediately after the Dow Jones article was published.

The carriers, however, contend that "there is no coverage for any investigatory Defense Costs incurred before the subsequent Claim is 'actually made.'" Office Depot disagrees, pointing out that the policy "does not contain any such language barring or limiting coverage for investigatory costs incurred after the date the first notice is submitted. The date of notice is the date on which all related Claims are 'considered made' for purposes of coverage." Without that express limitation, Office Depot believes its reading of the policy is, at the very least, a reasonable interpretation of the language, and thus the policy should be construed in favor of coverage.

13

We disagree. After analyzing the policy as a whole, it is clear that Section 7 does not cover the costs incurred between the filing of the initial notice of circumstances and the time a Claim is made against an Insured. Nothing in the language of Section 7 indicates that it extends coverage to Defense Costs incurred after a notice is filed but before a Claim actually exists. Instead, it creates a notification process for Claims filed both inside and outside of the Policy Period. Importantly, Section 5 of the policy, entitled "Limit of Liability (For All Loss-Including Defense Costs)," illuminates the role of Section 7. It states that "*a Claim which is made subsequent to the Policy Period . . . which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period . . .* shall also be subject to the one aggregate Limit of Liability . . . ." (emphasis added). Since we read the entire policy to determine its meaning, Section 5 provides a clear indication that Section 7's provisions determine the Policy Period that Claims are "considered made," rather than expand coverage to the costs incurred before a Claim is actually made. Therefore, the policy does not cover the Defense Costs associated with the SEC investigation—which did not constitute a Claim against Office Depot until events such as the issuance of subpoenas and Wells Notices occurred.

IV.

14

Based on the foregoing, we affirm the decision of the district court.[12]

**AFFIRMED.**

---

[12] Because we have concurred in the district court's result, we necessarily decline to grant Office Depot's request for partial summary judgment.